30 F.3d 1390
 Sharon Ann BELCHER, as Administratrix of the Estate of Rocky
L. Belcher, Deceased, Plaintiff-Appellee,
v.
The CITY OF FOLEY, ALABAMA, Defendant,
James Anderson; Officer Jimmy Roberson; Charles McKinley;
Dwain Riebeling, Defendants-Appellants.
Sharon Ann BELCHER, as Administratrix of the Estate of Rocky
L. Belcher, Deceased, Plaintiff-Appellee,
v.
The CITY OF FOLEY, ALABAMA; James Anderson; Officer Jimmy
Roberson; Defendants,
Charles McKinley, Defendant-Appellant,
Dwain Riebeling, Defendant.
 Nos. 93-6654, 93-6704.
 United States Court of Appeals,
Eleventh Circuit.
 Sept. 2, 1994.
 
 Helen J. Alford, William Wasden, Mobile, AL, for Dwain Riebeling.
 Carroll H. Sullivan, W. Pemble Deashmet, Mobile, AL, for Jimmy Roberson.
 Alex L. Holtsford, Jr., Montgomery, AL, for James Anderson.
 Glenda G. Cochran, Sandra L. Vinik, Birmingham, AL, for Sharon Ann Belcher.
 D. Scott Wright, Weyman W. McCrainie, Jr., Mobile, AL, for Charles McKinley.
 Appeals from the United States District Court for the Southern District of Alabama.
 Before EDMONDSON and CARNES, Circuit Judges, and HENDERSON, Senior Circuit Judge.
 CARNES, Circuit Judge:
 
 
 1
 Rocky L. Belcher committed suicide slightly more than two hours after he was arrested and placed in jail at the Foley, Alabama, police station. Mr. Belcher's mother, Sharon Ann Belcher, acting as the administratrix of her son's estate, sued the City of Foley, Foley's Chief of Police, and three Foley police officers, alleging claims under 42 U.S.C. Sec. 1983 and Alabama's wrongful death statute, Ala.Code Ann. Sec. 6-5-410 (1993). The individual defendants moved for summary judgment, raising qualified immunity defenses to the section 1983 claims against them in their individual capacities. The district court denied their motions and they now appeal. Because we conclude that, at the time of Mr. Belcher's suicide, the law did not clearly establish that the conduct of the individual defendants in this case constituted deliberate indifference toward Mr. Belcher, we reverse the denial of summary judgment on qualified immunity grounds.
 
 I. BACKGROUND
 A. FACTS
 
 2
 In reviewing the district court's denial of the defendants' summary judgment motions, we view the facts in the light most favorable to the plaintiff. See Kelly v. Curtis, 21 F.3d 1544, 1546 (11th Cir.1994).[1] "Thus, what we state as 'facts' in this opinion for purposes of reviewing the rulings on the summary judgment motions may not be the actual facts," which would be established at trial. Swint v. City of Wadley, 5 F.3d 1435, 1439 (11th Cir.1993), modified, 11 F.3d 1030 (11th Cir.), cert. granted, --- U.S. ----, 114 S.Ct. 2671, 129 L.Ed.2d 808 (1994).
 
 
 3
 On the evening of August 2, 1991, Dorothy Milton and her daughter returned to their Foley home to find Mrs. Milton's eighty-year-old mother, Mary Searcy, standing in a neighboring yard. Mrs. Searcy, who lives two houses away from Mrs. Milton, told them that Rocky Belcher, who lived with her, had turned on the gas in her house and was trying to kill himself and her. (Rocky Belcher, who was 36 years old, was Mrs. Searcy's grandson and Mrs. Milton's nephew.)
 
 
 4
 At 10:34 p.m., Mrs. Milton called the Foley, Alabama, police department for assistance. Corporal Charles McKinley, who was the shift supervisor at that time, and Officers Jimmy Roberson and Dwain Riebeling responded to her call. When the officers arrived at Mrs. Milton's house, she explained to Corporal McKinley that Mr. Belcher was intoxicated, that he had threatened to kill himself and Mrs. Searcy, and that she believed he needed "professional," meaning psychiatric, help. During the conversation between Corporal McKinley and Mrs. Milton, Mr. Belcher walked over from Mrs. Searcy's house and stood next to Corporal McKinley's patrol car, which was parked in front of Mrs. Milton's house. Mr. Belcher was visibly intoxicated. Corporal McKinley instructed Officer Riebeling to arrest Mr. Belcher for public intoxication. Corporal McKinley then left to respond to another call.
 
 
 5
 Officer Riebeling arrested Mr. Belcher for public intoxication and took him to the Foley jail. While Officer Riebeling questioned Mr. Belcher for the purpose of filling out an arrest report, Mr. Belcher became belligerent. Officer Riebeling placed him in a cell. A few minutes later, Mr. Belcher began shouting that he needed his medication. Officer Riebeling went to Mr. Belcher's cell and asked him what type of medication he needed. Mr. Belcher responded only that the medication was at his house. When Corporal McKinley returned to the station, Officer Riebeling told him that Mr. Belcher had asked for his medication. Corporal McKinley said that he would take care of it.
 
 
 6
 At 11:00 p.m., Sergeant Brantley relieved Corporal McKinley as the shift supervisor, even though McKinley's shift did not officially end until midnight.[2] Officer Eddie McDonald also came on duty at 11:00 p.m.
 
 
 7
 Following Mr. Belcher's request for medication, Officer Roberson checked on Mr. Belcher three times, over a period of about thirty minutes, and on the third occasion discovered Mr. Belcher attempting to hang himself. Mr. Belcher was standing on the toilet with a strip of cloth from his shirt wrapped around his neck, and he was tying the cloth to a light fixture mounted on the wall or to an air conditioning vent. Officer Roberson unlocked the cell door and shouted for assistance. He grabbed Mr. Belcher around the waist, pulled him down off of the toilet and onto the floor. About that time, both Corporal McKinley and Officer Riebeling arrived at Mr. Belcher's cell to assist Officer Roberson. Corporal McKinley decided that Mr. Belcher should be moved to a bare cell, which has no toilet and no bed. As the officers attempted to move Mr. Belcher, he broke away and stuck his head into the toilet in an attempt to drown himself. The officers subdued Mr. Belcher, then moved him to the bare cell and took his shirt from him.
 
 
 8
 Officer Roberson stayed and talked with Mr. Belcher to calm him. Mr. Belcher told Officer Roberson that he was depressed because, that day, his ex-wife had married another man. He requested his medication, again, and said that he needed to talk to his psychiatrist. After about ten minutes, Officer Roberson left to do some paperwork. He continued to check on Mr. Belcher approximately every five minutes, during which time Mr. Belcher appeared calm.
 
 
 9
 Meanwhile, Corporal McKinley telephoned Chief Investigator Walter Crook, the senior officer available for duty that night, to tell him about Mr. Belcher's suicide attempt. Over the phone, Investigator Crook advised Corporal McKinley to obtain a warrant charging Mr. Belcher with disorderly conduct so that he could be transferred to the county jail in Bay Minette, Alabama, which is equipped to deal with suicidal inmates. Investigator Crook also recommended that a family member, rather than a police officer, should attest that Mr. Belcher had been guilty of disorderly conduct. Corporal McKinley then instructed the police department dispatcher to locate a magistrate judge who could issue a warrant charging Mr. Belcher with disorderly conduct. Soon thereafter, Investigator Crook came to the jail. When the dispatcher could not find the magistrate judge who lived in Foley, Investigator Crook told Corporal McKinley that they were "going to have to sit with [Mr. Belcher], baby-sit him for twenty-four hours a day."
 
 
 10
 Eventually, the dispatcher located a magistrate judge who lived in Robertsdale, Alabama. According to Corporal McKinley, he then sent Officer McDonald to Mrs. Milton's house to see if she or her daughter would sign an affidavit for a warrant charging Mr. Belcher with disorderly conduct. However, there is evidence that Officer McDonald did not ask Mrs. Milton to do so, and for present purposes, we must assume he did not.[3]
 
 
 11
 Shortly after Investigator Crook told Corporal McKinley that they would have to "baby-sit" Mr. Belcher, Crook ordered all of the officers at the jail to meet in the courtroom to see a plan for a new alarm system. Officer Roberson checked on Mr. Belcher immediately before leaving for the meeting. He and the other officers then left Mr. Belcher unattended for somewhat longer than four minutes.[4] During that time, Mr. Belcher hung himself using the elastic from his underwear that he had tied to the lower bar of the jail-cell door. Immediately after the meeting ended, Investigator Crook went to Mr. Belcher's cell and found him hanging. He shouted for assistance. Officer Riebeling and Corporal McKinley responded. Officer Riebeling cut the elastic, while Corporal McKinley opened the cell door. Corporal McKinley checked for vital signs, then began performing CPR. Investigator Crook instructed the dispatcher to call the paramedics.
 
 
 12
 An ambulance arrived at 12:24 a.m., August 3, 1991. Ambulance medical personnel took over attempts to resuscitate Mr. Belcher and transported him to the South Baldwin Hospital a few minutes later. Mr. Belcher was declared dead on arrival.
 
 
 13
 Just over two hours had elapsed from the moment that the officers were first called to the scene of Mr. Belcher's disturbance until Mr. Belcher was pronounced dead at the hospital.
 
 B. PROCEDURAL HISTORY
 
 14
 On August 3, 1992, Sharon Ann Belcher, as the administratrix of Mr. Belcher's estate, filed this section 1983 action against the City of Foley, Foley Police Chief James Anderson, Corporal Charles McKinley, Officer Jimmy Roberson, and Officer Dwain Riebeling, alleging deprivations of Mr. Belcher's constitutional rights. She alleged that the City and Chief Anderson (individually and in his official capacity) were liable under section 1983 for policies and customs that violated the constitutional rights of mentally ill and suicidal jail inmates and that caused Mr. Belcher's death. She also alleged that Corporal McKinley, Officer Roberson, and Officer Riebeling (individually and in their official capacities) were liable because they had caused Mr. Belcher's death by acting with deliberate indifference to his medical and psychiatric needs and to his safety from self-harm. Finally, she asserted a pendent state law wrongful death claim against all of the defendants.[5]
 
 
 15
 Each of the individual defendants filed a timely answer to the allegations and moved for summary judgment, raising qualified immunity as a defense to suit under section 1983. The district court denied the defendants' qualified immunity motions. The individual defendants then filed this interlocutory appeal. We have jurisdiction over an interlocutory appeal of the denial of qualified immunity. E.g., Mitchell v. Forsyth, 472 U.S. 511, 530, 105 S.Ct. 2806, 2817, 86 L.Ed.2d 411 (1985). Mrs. Belcher's claims against the City and against the officers in their official capacities are not at issue in this appeal.
 
 II. DISCUSSION
 A. QUALIFIED IMMUNITY LAW
 
 16
 Chief Anderson, Corporal McKinley, Officer Roberson, and Officer Riebeling contend that they are entitled to qualified immunity insofar as the claims against them in their individual capacities are concerned. The denial of qualified immunity is a question of law reviewed de novo. Swint v. City of Wadley, 5 F.3d 1435, 1441 (11th Cir.1993), modified, 11 F.3d 1030 (11th Cir.), cert. granted, --- U.S. ----, 114 S.Ct. 2671, 129 L.Ed.2d 808 (1994).
 
 
 17
 "Qualified immunity protects government officials performing discretionary functions from civil trials (and the other burdens of litigation, including discovery) and from liability if their conduct violates no 'clearly established statutory or constitutional rights of which a reasonable person would have known.' " Lassiter v. Alabama A & M Univ., 28 F.3d 1146, 1149 (11th Cir.1994) (en banc) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982)). There is no dispute that the defendants' allegedly unconstitutional actions fell within their discretionary authority. Thus, to overcome the defendants' qualified immunity, Mrs. Belcher must establish that the defendants' conduct violated a " 'clearly established statutory or constitutional right[ ] of which a reasonable person would have known.' " Id.
 
 
 18
 In satisfying this burden, the plaintiff cannot point to sweeping propositions of law and simply posit that those propositions are applicable. Instead, the plaintiff must draw the court's attention toward a more particularized and fact-specific inquiry ... show[ing] that there existed sufficient case law establishing the contours of his or her constitutional rights such that the unlawfulness of the defendant's conduct would have been apparent to a reasonable official in the same circumstances.... If no such case law exists, then the defendant is entitled to qualified immunity.
 
 
 19
 Nicholson v. Georgia Dept. of Human Resources, 918 F.2d 145, 147 (11th Cir.1990) (citations omitted); see also Barts v. Joyner, 865 F.2d 1187, 1190 (11th Cir.1989) ("[P]laintiffs must prove the existence of a clear, factually defined, well-recognized right of which a reasonable police officer should have known.... The right must be sufficiently particularized to put potential defendants on notice that their conduct probably is unlawful." (First emphasis added.)) "Unless a government agent's act is so obviously wrong, in the light of pre-existing law, that only a plainly incompetent officer or one who was knowingly violating the law would have done such a thing, the government actor has immunity from suit." Lassiter, 28 F.3d at 1149 (citing Malley v. Briggs, 475 U.S. 335, 341-43, 106 S.Ct. 1092, 1096-97, 89 L.Ed.2d 271 (1986)). Thus:
 
 
 20
 When considering whether the law applicable to certain facts is clearly established, the facts of cases relied upon as precedent are important. The facts need not be the same as the facts of the immediate case. But they do need to be materially similar. See, e.g., Edwards v. Gilbert, 867 F.2d 1271, 1277 (11th Cir.1989). Public officials are not obligated to be creative or imaginative in drawing analogies from previously decided cases.
 
 
 21
 Adams v. St. Lucie County Sheriff's Dept., 962 F.2d 1563, 1575 (11th Cir.1992) (Edmondson, J., dissenting), approved en banc, 998 F.2d 923 (11th Cir.1992). "For qualified immunity to be surrendered, pre-existing law must dictate, that is, truly compel (not just suggest or allow or raise a question about), the conclusion for every like-situated, reasonable government agent that what defendant is doing violates federal law in the circumstances." Lassiter, 28 F.3d at 1150.
 
 B. MR. BELCHER'S CONSTITUTIONAL RIGHTS
 
 22
 Mr. Belcher was a pretrial detainee when he committed suicide. Although "the Eighth Amendment prohibitions against cruel and unusual punishment do not apply to pretrial detainees," Tittle v. Jefferson County Comm'n, 10 F.3d 1535, 1539 n. 3 (11th Cir.1994) (en banc) (citing Ingraham v. Wright, 430 U.S. 651, 671-72 n. 40, 97 S.Ct. 1401, 1412-13 n. 40, 51 L.Ed.2d 711 (1977)), this Court has held that "in regard to providing pretrial detainees with such basic necessities as food, living space, and medical care the minimum standard allowed by the due process clause is the same as that allowed by the eighth amendment for convicted persons," Hamm v. DeKalb County, 774 F.2d 1567, 1574 (11th Cir.1985); accord Tittle, 10 F.3d at 1539; Edwards v. Gilbert, 867 F.2d 1271, 1274 (11th Cir.1989).
 
 
 23
 Under the Eighth Amendment, prisoners have a right to receive medical treatment for illness and injuries, Estelle v. Gamble, 429 U.S. 97, 103-05, 97 S.Ct. 285, 290-91, 50 L.Ed.2d 251 (1976), which encompasses a right to psychiatric and mental health care, Rogers v. Evans, 792 F.2d 1052, 1058 (11th Cir.1986), and a right to be protected from self-inflicted injuries, including suicide, Edwards, 867 F.2d at 1274-75. Prison guards who display deliberate indifference to the serious medical and psychiatric needs of a prisoner, or deliberate indifference to a "strong likelihood" that a prisoner will take his own life, violate the Eighth Amendment and may be liable under section 1983. Estelle, 429 U.S. at 104-05, 97 S.Ct. at 291; Edwards, 867 F.2d at 1274-75; Rogers, 792 F.2d at 1058.
 
 
 24
 C. THE INDIVIDUAL DEFENDANTS' QUALIFIED IMMUNITY
 
 
 25
 We now consider whether each of the individual defendants is protected by qualified immunity.
 
 1. Chief Anderson
 
 26
 Chief Anderson had no direct contact with Mr. Belcher. Mrs. Belcher seeks to hold him liable for failing to provide a written policy or training to his officers in the proper handling of mentally ill and suicidal inmates, and for failing to cover the bars of the jail cell doors.[6] "Supervisory officials are not liable under section 1983 on the basis of respondeat superior or vicarious liability." Hardin v. Hayes, 957 F.2d 845, 849 (11th Cir.1992). They may, however, be liable under section 1983 "when there is a causal connection between actions of the supervising official and the alleged constitutional deprivation." Brown v. Crawford, 906 F.2d 667, 671 (11th Cir.1990).
 
 
 27
 At the time of Mr. Belcher's death in August 1991, Chief Anderson had been the City's police chief for two-and-one-half years. As such, he had a duty to train police officers and to establish policies governing their conduct. Pursuant to an unwritten policy, Foley police officers were required to check on jail inmates every hour, unless the inmate was "unstable." Officers were to check "unstable" inmates more frequently. When an inmate needed medical treatment, an officer either took him to a hospital or called a local ambulance service to the jail to administer care. If an inmate had prescription medication, an officer or a dispatcher administered it. When an inmate was suicidal, officers were expected to place him alone in a cell, without other inmates. Further, officers had the discretion to put the inmate in a cell that had been stripped of furnishings to reduce the possibility of suicide. In July 1991, only a month before Mr. Belcher's death, Chief Anderson had written and distributed a new set of police department policies, but those policies did not address any aspect of the jail, such as the handling of mentally ill or suicidal inmates.
 
 
 28
 Even before Anderson became Chief of Police, he was aware that an inmate had committed suicide in the Foley jail in 1984. He had investigated that suicide while serving as Chief Deputy Sheriff of Baldwin County, Alabama. Chief Anderson's awareness of the risk of jail suicides was further heightened eight months before Mr. Belcher's suicide, when Walter Cygan, a representative of the Alabama Municipal Insurance Corporation, inspected the Foley jail as part of a loss control evaluation for the City. In January 1991, Cygan sent a letter to Fred Mott, the City Administrator, that stated: "[Y]ou [should] consider some type of protection over the jail bars, so that ... a smooth surface can be created; thus eliminating the potential exposure from tying some material on to these bars and committing suicide." Chief Anderson received a copy of that letter and asked Mr. Mott for funds to cover the bars; he did not receive that funding until after Mr. Belcher's suicide.
 
 
 29
 a. Failure to Provide a Written Policy
 
 
 30
 Mrs. Belcher contends that Chief Anderson acted with deliberate indifference to her son's life by not providing a written policy for the handling of suicidal inmates. In Schmelz v. Monroe County, 954 F.2d 1540 (11th Cir.1992), a case decided after Mr. Belcher's death, this Court held that a sheriff who had an unwritten policy that "made an effort to identify and protect potentially suicidal inmates from self-harm" was not guilty of deliberate indifference. Id. at 1544. Chief Anderson's unwritten policy for the handling of "unstable" inmates met the Schmelz standard. Our decisions prior to Mr. Belcher's death do not require any more, in the way of a policy, than does Schmelz. Therefore, it could not have been clearly established at the time of Mr. Belcher's death that a police chief's failure to have a written policy for the handling of suicidal inmates constituted deliberate indifference.
 
 
 31
 b. Failure to Train
 
 
 32
 Mrs. Belcher contends that Chief Anderson's failure to train his officers in the handling of suicidal inmates constituted deliberate indifference to her son's life. A supervisory official is not liable under section 1983 for an injury resulting from his failure to train subordinates unless his "failure to train amounts to deliberate indifference to the rights of persons with whom the subordinates come into contact" and the failure has actually caused the injury of which the plaintiff complains. Popham v. City of Talladega, 908 F.2d 1561, 1564-65 (11th Cir.1990); Greason v. Kemp, 891 F.2d 829, 837 n. 15 (11th Cir.1990); cf. City of Canton v. Harris, 489 U.S. 378, 388, 390, 109 S.Ct. 1197, 1204-05, 103 L.Ed.2d 412 (1989) (addressing the analogous situation of municipal liability under section 1983). Only when the failure to train amounts to "deliberate indifference" can it properly be characterized as the "policy" or "custom" that is necessary for section 1983 liability to attach. City of Canton, 489 U.S. at 389, 109 S.Ct. at 1205. Failure to train can amount to deliberate indifference when the need for more or different training is obvious, id. at 390, 109 S.Ct. at 1205, such as when there exists a history of abuse by subordinates that has put the supervisor on notice of the need for corrective measures, Greason, 891 F.2d at 837, and when the failure to train is likely to result in the violation of a constitutional right, City of Canton, 489 U.S. at 390, 109 S.Ct. at 1205.
 
 
 33
 Mrs. Belcher contends that Chief Anderson's failure to train his officers in the handling of suicidal inmates amounted to deliberate indifference to the constitutional rights of suicidal inmates with whom the officers came into contact. She argues that the 1984 suicide and the recommendations of Cygan, the representative of the Alabama Municipal Insurance Corporation, put Chief Anderson on notice of the need to train his officers in the handling of suicidal inmates. In response to Chief Anderson's qualified immunity defense, Mrs. Belcher contends that, at the time of her son's death, Greason v. Kemp, 891 F.2d 829 (11th Cir.1990), clearly established that a reasonable supervisory official who knows of a previous suicide in his facility, but who fails to train his subordinates in the proper handling of suicidal inmates, acts with deliberate indifference.
 
 
 34
 Mrs. Belcher's contention requires too much of an inductive leap to defeat Chief Anderson's qualified immunity. Although Greason denied qualified immunity to two supervisory officials who, among other things, failed to establish procedures to help subordinates in their facility to identify inmates having suicidal tendencies and to prevent suicides, that case did not clearly establish the law applicable to Chief Anderson's conduct. To a large degree, Greason involved the practice of medicine. The two Greason supervisory defendants were the clinical director and the warden of a state mental health evaluation facility. 891 F.2d at 833. They supervised psychiatrists, support staff, and guards, who dealt routinely with inmates likely to inflict self-harm. Id. at 837, 839. The inmate who committed suicide in Greason did so after his medication was discontinued by a staff psychiatrist who visited the facility only once a week for six-and-one-half hours, during which time he saw twenty-five or thirty inmates for less than fifteen minutes each. Id. at 832. Only one year before the Greason inmate's suicide, at the same facility, another inmate whose medication had been discontinued by the same psychiatrist had committed several acts of self-mutilation. Id. at 838, 840.
 
 
 35
 The clinical director and the warden of the mental health facility who were defendants in Greason were in positions materially different from Chief Anderson's. On a daily basis their principal responsibility was to coordinate the provision of medical and psychiatric services to prisoners who were patients in a mental health facility. By contrast, Chief Anderson's principal responsibility was to supervise the enforcement of laws and to arrest suspected violators in his community. Additionally, the previous incident of self-harm at the facility in Greason is distinguishable from the previous Foley jail suicide. The Greason inmate committed suicide only one year after an incident of self-harm by another inmate at that facility who had been treated by the same psychiatrist and in the same manner as the Greason inmate. After that first incident of self-harm, nothing at the facility in Greason was changed to prevent the same thing from happening again. By contrast, the previous suicide in the Foley jail occurred seven years before Mr. Belcher's and that inmate had hung himself with a sheet tied through a cement block above the cell door. After that first Foley jail suicide, officials had filled holes in the cement blocks and had removed all of the furnishings, including sheets, from one cell; Mr. Belcher was placed in that cell as a precautionary measure. Mrs. Belcher cites no decisions other than Greason to clearly establish that Chief Anderson's failure to train his officers amounted to deliberate indifference, and we find none that do. Therefore, we conclude that, at the time of Mr. Belcher's death, the law was not clearly established that Chief Anderson's failure to train his officers in the handling of suicidal inmates amounted to deliberate indifference to Mr. Belcher's constitutional rights.
 
 
 36
 c. Failure to Prevent Suicides by Covering the Bars of the
 
 Jail-Cell Doors
 
 37
 Mrs. Belcher also contends that, at the time of her son's death, it was clearly established that a reasonable jail official, who knew that an inmate could hang himself by tying some material to the bars of a jail-cell door and yet who failed to prevent that possibility, was acting with deliberate indifference to an inmate's taking of his life. She cites no decisions supporting her contention. Instead, she relies upon the National Commission on Correctional Health Care's 1987 "Standards for Health Services in Jails" and the requirements of the Commission on Accreditation for Law Enforcement Agencies. Such non-legally enforceable standards are not the law and cannot clearly establish it. Our research reveals no decisions clearly establishing that a police chief who fails to cover the bars of the jail-cell doors is acting with deliberate indifference to inmates who seek to take their own lives. Therefore, we conclude that, at the time of Mr. Belcher's death, this contention was not clearly established law.
 
 
 38
 d. Conclusion as to Chief Anderson
 
 
 39
 Because at the time of Mr. Belcher's death no decision had clearly established that Chief Anderson's actions or inactions constituted deliberate indifference, he is entitled to qualified immunity.
 
 
 40
 2. Corporal McKinley, Officer Roberson, and Officer Riebeling
 
 
 41
 Mrs. Belcher contends that Corporal McKinley, Officer Roberson, and Officer Riebeling acted with deliberate indifference to Mr. Belcher's serious medical and psychiatric needs by failing to take Mr. Belcher to a hospital, failing to obtain his medication, and failing to determine the name of, and to contact, his psychiatrist. Mrs. Belcher further contends that Corporal McKinley acted with deliberate indifference to Mr. Belcher's life by failing to transfer him to the Baldwin County jail and by failing to assign an officer to guard him continuously. Officers Roberson and Riebeling, she contends, acted with deliberate indifference to Mr. Belcher's life by leaving him unguarded, particularly while they met in the courtroom with Investigator Crook.
 
 
 42
 To overcome the officers' qualified immunity defenses, Mrs. Belcher maintains that, at the time of her son's death, the law was clearly established that reasonable officers, in circumstances materially similar to these officers, would have known that their conduct amounted to deliberate indifference. Mrs. Belcher first asserts that Waldrop v. Evans, 871 F.2d 1030 (11th Cir.1989), clearly established that officers in circumstances materially similar to the defendants', who fail to notify competent authorities of an inmate's request for medication and psychiatric help, are guilty of deliberate indifference to the inmate's psychiatric needs. Officer Roberson is the only officer who did not notify a superior officer about Mr. Belcher's request for medication and request to see his psychiatrist.[7] Therefore, we can assume either that Mrs. Belcher's argument based on Waldrop is directed at Officer Roberson only, or that by the term "competent authorities," Mrs. Belcher means mental health professionals and she is contending that all of the defendants should have notified a mental health professional of Mr. Belcher's medical and psychiatric needs.
 
 
 43
 As the district court recognized, Waldrop could not have clearly established the law governing the conduct of police officers in positions materially similar to Officer Roberson's or any of the other defendant police officers in this case, because Waldrop addressed the liability of a physician at a state mental health evaluation facility who failed to notify the facility's staff psychiatrist that an inmate under that psychiatrist's care had committed an act of self-mutilation when his medication was discontinued. 871 F.2d at 1036.[8] The defendants in this case are not physicians and are not responsible for meeting the medical and psychiatric needs of inmates in a mental health evaluation facility. They are police officers whose primary responsibility is to enforce laws and to arrest persons suspected of violating laws in their community. Because the circumstances in Waldrop are not materially similar to the circumstances in this case, Waldrop did not clearly establish the law applicable to this case.
 
 
 44
 Mrs. Belcher next cites Popham v. City of Talladega, 908 F.2d 1561 (11th Cir.1990), and Edwards v. Gilbert, 867 F.2d 1271 (11th Cir.1989), contending that those cases clearly established that a jail official, who knows that an inmate has attempted suicide and leaves the inmate unguarded in a cell with barred doors and the means to hang himself, is guilty of deliberate indifference to the inmate's taking of his own life.[9] Neither case clearly established that proposition.
 
 
 45
 Popham held that the actions of the defendants in that case did not constitute deliberate indifference, 908 F.2d at 1565; consequently, it could not have clearly established that the actions of the defendants in this case did constitute deliberate indifference. Law is clearly established by holdings, not by inferences from language in opinions. But even if every sentence in the Popham decision established law, that decision contains more language unfavorable than favorable to Mrs. Belcher. For example, Popham states:
 
 
 46
 Plaintiff complains of the fact that there were no guards on duty for the last shift and the failure of the camera to cover the small area of the cell in which the decedent committed suicide, but cites no cases for the proposition that deliberate indifference is demonstrated if prisoners are not seen by jailers at all times.
 
 
 47
 908 F.2d at 1565. Popham therefore rejected any argument that failing to guard an inmate continuously constitutes deliberate indifference.
 
 
 48
 Nor did the Edwards decision clearly establish that the actions of the defendants in this case constitute deliberate indifference. In Edwards, a jail suicide case, this Court reversed the denial of summary judgment to jail officials on qualified immunity grounds. 867 F.2d at 1277. Our holding that the Edwards defendants' actions did not constitute deliberate indifference under clearly established law, does not establish, clearly or otherwise, that the actions of the defendants in this case do constitute deliberate indifference.
 
 
 49
 Finally, Mrs. Belcher relies on two cases from other circuits that this Court cited with approval in our Edwards opinion: Cabrales v. County of Los Angeles, 864 F.2d 1454 (9th Cir.1988), and Partridge v. Two Unknown Police Officers, 791 F.2d 1182 (5th Cir.1986). She argues that those cases clearly established that the defendants' conduct in this case constituted deliberate indifference. Although, for reasons we explain, we find these out-of-circuit cases distinguishable, by distinguishing them, "we do not mean to imply that the law [of this Circuit] can be clearly established for qualified immunity purposes by non-binding precedent." Kelly v. Curtis, 21 F.3d 1544, 1550 n. 6 (11th Cir.1994); see also Hansen v. Soldenwagner, 19 F.3d 573, 578 n. 6 (11th Cir.1994) ("[T]he case law of one other circuit cannot settle the law in this circuit to the point of being 'clearly established.' ").
 
 
 50
 In Cabrales, the Ninth Circuit held that a county jail supervisor, sued under section 1983, could not challenge the sufficiency of the evidence to support a jury finding that he had been deliberately indifferent to the medical and psychiatric needs of an inmate who committed suicide in his facility, because the jail official had not moved for a directed verdict at the close of all of the evidence. 864 F.2d at 1459. Accordingly, the Ninth Circuit limited its appellate review to a search for plain error in the jury's finding. Id. The jury based its finding of deliberate indifference on the fact that jail officials had ordered the inmate into solitary confinement for ten days, even though they knew that, while in solitary confinement only months before, the inmate had attempted suicide to get himself returned to the general prison population. Id. at 1456-57. Thereafter, the inmate hung himself. Id. at 1457. The Cabrales court found this evidence sufficient, under the plain error doctrine, to support the jury's finding of deliberate indifference. Id. at 1459.
 
 
 51
 The Cabrales court did not indicate what steps jail officials had taken to prevent the Cabrales inmate's suicide, raising the possible inference that no preventive measures were taken. Here, the defendants took several steps to prevent suicide. After Mr. Belcher's first attempt at suicide, the officers moved him from a furnished cell to an unfurnished cell and took away his shirt to prevent future suicide attempts. Officer Roberson checked on Mr. Belcher every five minutes, and Corporal McKinley took steps to obtain a warrant to have Mr. Belcher transferred to a facility better equipped to handle a suicidal inmate. Because of the lack of details concerning jail officials' efforts to prevent the Cabrales inmate's suicide and the limited nature of the Ninth Circuit's review in Cabrales, that decision could not have clearly established the law governing the defendants' conduct in this case, even if it had been a decision of this Circuit.
 
 
 52
 Partridge offers no better support for Mrs. Belcher's case. In Partridge, a district court had dismissed a section 1983 action against jail officials who allegedly were deliberately indifferent to the psychiatric needs of a pretrial detainee who committed suicide three hours after being placed in a cell. 791 F.2d at 1183-84. The defendants in Partridge allegedly knew that the detainee was mentally ill and allegedly had access to clinical records revealing that the inmate was suicidal. Id. at 1184. On appeal, the Fifth Circuit reviewed the district court's order terminating the case both as a dismissal and as a summary judgment. Reviewing the district court's order as a dismissal, the Partridge court held that it was due to be reversed because the allegations, including the allegation that the police took no steps to protect the inmate from self-harm, were sufficient to establish deliberate indifference. Id. at 1185, 1187. Reviewing the district court's order as a summary judgment, the Partridge court concluded that it was due to be reversed, stating that, because there was no evidence that the defendants took any steps to protect the detainee from self-harm, there existed genuine issues of material fact as to deliberate indifference. Id. at 1189. Specifically, the Partridge court was concerned with whether the officers had taken steps to check the inmate's clinical records and whether they had checked on the inmate during the three hours between placing him in the cell and finding him dead. Id. In this case, by contrast, the defendants took steps to prevent Mr. Belcher from killing himself. Not only was he placed in a stripped-down cell, but an officer checked on him every five minutes. Because of the lack of evidence of preventive measures in Partridge, even if the decision had been one of this circuit, it could not have clearly established that the preventive measures taken by the defendants in this case constituted deliberate indifference.
 
 
 53
 After reviewing the case law at the time of Mr. Belcher's death, we conclude that it did not clearly establish that measures materially similar to those taken by Corporal McKinley, Officer Roberson, and Officer Riebeling, to prevent Mr. Belcher from committing suicide, were so inadequate as to constitute deliberate indifference. Therefore, these defendants are entitled to qualified immunity from suit in their individual capacities.
 
 III. CONCLUSION
 
 54
 For the reasons stated herein, the district court's denial of qualified immunity to Chief Anderson, Corporal McKinley, Officer Roberson, and Officer Riebeling is REVERSED. We decline to exercise our discretion to review the remaining claims under pendent appellate jurisdiction, see, e.g., Kelly v. Curtis, 21 F.3d 1544, 1557 (11th Cir.1994), and REMAND the case for further proceedings consistent with this opinion.
 
 
 
 [1]
 On appeal, Mrs. Belcher filed a motion, pursuant to Fed.R.App.P. 10(e), to supplement the record with entire depositions of which the district court had only excerpts when it ruled on the summary judgment motions. The defendants opposed her motion and moved to strike her brief, because she attached deposition pages with which she sought to supplement the record. These motions were carried with the case
 Thereafter, the district court supplemented the record in this case to reflect the proceedings in the district court accurately. Accordingly, Mrs. Belcher filed a letter with this Court contending that her Rule 10(e) motion, and the defendants' motions in opposition and motions to strike, are moot. We agree. See Hoover v. Blue Cross & Blue Shield, 855 F.2d 1538, 1543 n. 5 (11th Cir.1988) ("[T]he purpose of Rule 10(e) is to ensure that the record on appeal 'truly discloses what occurred in the district court.' " (Quoting Fed.R.App.P. 10(e)).
 
 
 [2]
 Sergeant Brantley was also referred to in deposition testimony as Sergeant Batley. It is not clear which spelling is correct
 
 
 [3]
 Although the Foley police department blotter from August 3, 1991, shows that Officer McDonald delivered a "message" to Mrs. Milton at 12:31 a.m., it does not state what that message was. Mrs. Milton testified in deposition that no officer ever asked her about signing a warrant. Thus, the evidence viewed in the light most favorable to the plaintiff is that Officer McDonald did not ask Mrs. Milton to sign a disorderly conduct warrant
 
 
 [4]
 The parties dispute how long the officers left Mr. Belcher unattended. Corporal McKinley and Officer Riebeling maintain that the meeting in the courtroom lasted two or three minutes, while Officer Roberson says that only two-and-a-half minutes passed between his checking on Mr. Belcher before leaving for the meeting and Investigator Crook's finding Mr. Belcher hanging. By contrast, the plaintiff's jail-suicide expert, Joseph Rowan, testified in deposition that, if CPR had been provided within four minutes of the time Mr. Belcher began hanging, he would not have died. Viewing the facts in the light most favorable to Mrs. Belcher, we must assume that Mr. Belcher was left unguarded for somewhat longer than four minutes
 
 
 [5]
 Mrs. Belcher did not sue Investigator Crook, the ranking officer on duty that night, or Sergeant Brantley, the shift supervisor after 11:00 p.m
 
 
 [6]
 Mrs. Belcher also contends that Chief Anderson is liable under section 1983 for violating Ala.Code Ann. Sec. 14-6-105 (1982), which requires all Alabama jails to have a nightwatchman. She raised this contention for the first time in her motion in opposition to summary judgment, filed in the district court. Even assuming that her contention was properly pleaded, it is without merit, because we held in Popham v. City of Talladega, 908 F.2d 1561, 1565 (11th Cir.1990), that failure to have a jail guard on duty at night does not, by itself, amount to deliberate indifference
 
 
 [7]
 Officer Riebeling relayed Mr. Belcher's request for medication to his superior, Corporal McKinley, who (according to Officer Riebeling's testimony) already knew of Mr. Belcher's psychiatric needs. Likewise, Corporal McKinley relayed all of the facts of Mr. Belcher's situation to his superior, Investigator Crook. Mrs. Belcher apparently does not contend that Investigator Crook, whom she has not sued, wrongfully failed to notify his superior officer
 
 
 [8]
 The incidents at issue in Waldrop and Greason occurred in the same mental health evaluation facility, but were separate incidents
 
 
 [9]
 Mrs. Belcher also cites Schmelz v. Monroe County, 954 F.2d 1540 (11th Cir.1992), for this proposition, but even assuming it stood for such a proposition, as we have already pointed out, Schmelz was decided after the conduct in this case occurred and, therefore, could not have clearly established the law at the time of the conduct in this case