**Jane DOE, Plaintiff,**

v.

**Jeanette GUSTAVUS, Holly Meier, Patricia Reese, Denise Camp, Colleen Rawson, Garrett Noyons, James Hebel, Tara Vande Kolk–Stamm, Tracy Rockow and Nurse Engelmann, Defendants.**

**No. 01–C–1288.**

United States District Court,
E.D. Wisconsin.

Aug. 29, 2003.

Jeff Scott Olson, Jeff Scott Olson Law Firm, Madison, WI, for Plaintiff.

James E. McCambridge, Wisconsin Department of Justice, Office of the Attorney General, Madison, WI, for Defendants.

## DECISION AND ORDER

GRIESBACH, District Judge.

Plaintiff Jane Doe brought this action under 42 U.S.C. § 1983 against ten defendants, all of whom are security or nursing staff at the Taycheedah Correctional Institute for women in Fond du Lac, Wisconsin. The plaintiff alleges that each of the defendants was deliberately indifferent to her serious medical needs while she was in custody. Specifically, many of the defendants allegedly ignored her cries for help and her medical needs while she went into labor in April 2001. Nursing supervisor Holly Meier is also implicated for failure to adequately train the nurses who treated the plaintiff. The defendants have moved for summary judgment on the grounds that there is no basis to find deliberate indifference, that two defendants had legitimate institutional objectives in their motives, and that they are all entitled to qualified immunity.

## I. Background

### 1. The Delivery of the Baby

The plaintiff was incarcerated at Taycheedah Correctional Institution (TCI) as

of February 21, 2001. At that time, she was well along in her pregnancy, with due date estimates ranging between April 10 and May 2 of that year. (Pltf. Prop. Findings of Fact ¶ 28, hereinafter, "PPFOF".) On April 18, Doe was told that she was being taken to have labor induced. She refused, but agreed to be induced sometime the next week. (PPFOF ¶ 76.)

According to the plaintiff, her refusal to be induced on April 18 caused a "stir" at TCI. (Pltf. Brief at 3.) Lt. Patricia Reese made Doe aware, apparently against prison policy, that her next induction appointment would be April 25. Since knowledge of an off-site appointment could pose a security risk, defendant Gustavus ordered Doe put into segregated confinement on April 20. (PPFOF ¶ 99.) In "seg," there is less interaction with guards and other inmates, and the cells are more spartan, with doors instead of bars.

Around 1:00 AM on April 21, Doe's water broke in a "big gush," and she was able to get a set of dry clothes from a guard. Four hours later, Nurse Engelmann tested Doe's pants, but no amniotic fluid was found because, according to the plaintiff, the pants had dried out by this point. (PPFOF ¶ 148.) Nurse Engelmann did not apparently ever speak to Doe. (PPFOF ¶ 150.)

At 7:30 AM Doe pressed an emergency buzzer in her room and asked defendant Camp, a guard, whether she would be taken to the hospital soon because her water had broken. (PPFOF ¶ 154.) Camp replied in the negative, apparently relying on the Nurse Engelmann's test indicating that Doe's water had not broken. (PPFOF ¶ 155.) Camp also said that no pain medication would be forthcoming and a nurse would not arrive until there was a crowning. (PPFOF ¶ 156.) The defendants claim that a nurse (defendant Hebel) had told Camp that the plaintiff was having false labor, known as Brax-

ton Hicks contractions, but the plaintiff disputes this. (DPFOF ¶ 81; Pltf's Response to DPFOF ¶ 81.) Also disputed is whether Sgt. Camp, who was a trained EMT, "asked the plaintiff questions about her complaints of pain that any good EMT would ask." (DPFOF ¶ 80.)

In any event, the plaintiff did not see a nurse until approximately 1:00 PM, when Nurse Vande Kolk–Stamm was handing out medications. (DPFOF ¶ 28.) The nurse checked Doe's contractions through the small tray door in Doe's cell, noting that they were five to six minutes apart and lasted some thirty seconds. (PPFOF ¶¶ 188, 189.) The nurse concluded that the plaintiff was in false labor. At 9:15 that night the plaintiff was seen by Nurse Rockow. (DPFOF ¶ 41.) She also observed the plaintiff through the tray door, felt for contractions, and concluded that the plaintiff was in false labor. During the second shift of the 21st, Doe was called a "dumb bitch" by Sgt. Garrett Noyons, who also said that Doe would have to clean up her own vomit if she got sick again.

Around midnight, the plaintiff pressed the emergency button because she "just could not stand the pain anymore". (PPFOF ¶ 204, DPFOF ¶ 50.) Sgt. Rawson responded and called Nurse James Hebel. (PPFOF ¶ 205.) Doe complained of constant pain, and Hebel gave her some ibuprofen. (PPFOF ¶¶ 210, 213.) He timed her contractions, which were between fifteen and thirty seconds, and stated that if she were really in labor, the contractions would last about one minute. (PPFOF ¶ 211.) Hebel observed that Doe's skin appeared sweaty and that she was in pain, but he told her that the pain she was experiencing was in the wrong place for it to signify labor. (PPFOF ¶¶ 214, 215.) Around 1:10 AM on April 22, the plaintiff felt a "wet gush" down her legs, pressed the emergency button, and

Sgt. Rawson again called Nurse Hebel. (PPFOF ¶¶ 223, 224.) Hebel tested the discharge and then called the hospital to determine the meaning of the color blue on the nitrazine paper he used for the test. (DPFOF ¶ 55.) He also phoned the doctor on call, but was unable to reach him. (DPFOF ¶ 57.) He returned to Doe's cell at 2:01 AM and felt the plaintiff's abdomen, which felt soft to him. (DPFOF ¶ 59.) He asserts that the staff at St. Agnes Hospital (who were apparently advising him over the phone) told him the abdomen should be hard during a contraction, and since the plaintiff's was soft, he did not believe she was about to deliver. (DPFOF ¶ 59.) The plaintiff asserts that the information from St. Agnes was flawed because Hebel did not explain the entire situation to them, i.e., the plaintiff's symptoms and other signs of labor.

In any event, the situation at about 2:00 AM was that Hebel did not think the plaintiff was in immediate need of medical attention. The plaintiff was still in pain and, while changing into some dry clothes, felt some movement between her legs. (PPFOF ¶ 227.) She reached down and felt the baby's head and exclaimed, "the head, the head!" (PPFOF ¶¶ 227, 228.) Eventually she felt the baby's mouth and scooped some "gook" out of it. (PPFOF ¶ 230.) She then found it "pretty easy" to complete the delivery, and wrapped the baby in a dirty towel. (PPFOF ¶¶ 231, 232.) Nurse Hebel was contacted by radio at 2:16 AM, and he went to provide assistance. (DPFOF ¶ 60.)

Doe and the baby were taken to the hospital by ambulance, and Doe returned to TCI around 2:00 PM, some twelve hours later. (PPFOF ¶ 245.) Upon her return, she met with Capt. Gustavus, who allegedly stated that "she knew Doe had pushed that baby out on purpose, just to get out of segregation." (PPFOF ¶ 249.) Doe was then placed in maximum security on temporary lock-up (TLU), apparently due to Gustavus' belief that Doe had conspired with an inmate who had called Doe's parents regarding the delivery. (PPFOF ¶¶ 252–254.) While in TLU, Doe states that she was provided with no post-birth provisions such as ice or pads until 7:00 AM the next morning when pads were brought. (PPFOF ¶¶ 258, 259.)

Two weeks later, on May 7, Doe appeared at a hearing and was released from custody the same day. On October 20, the baby began to experience seizures, and Doe suggests that the baby's neurologist is "considering" that something "might" have happened to the baby at birth, because neurological testing and a spinal tap have been inconclusive. (PPFOF ¶ 270.)

### 2. Other Defendants

Other defendants were not direct parties to the birth. Defendant Meier was the nurse supervisor at TCI, and it is alleged that, "by her patently inadequate supervision, Defendant Meier failed to train her staff despite her knowledge of a substantial risk of serious harm to pregnant inmates." (Pltf. Brief at 20.) This failure to train constitutes deliberate indifference, it is alleged, because it "made it all but certain" that the nursing staff would fail to recognize when a birth was imminent. (Pltf. Brief at 21.) As to Capt. Gustavus, who did have some interaction with the plaintiff, she is alleged to have acted vindictively towards the plaintiff by fabricating the reason for putting Doe in seg to begin with.

## II. Analysis

Summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, show that there is no genuine issue of material fact and the moving party is entitled to judgment as a

matter of law. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). As the defendants have moved for summary judgment, they have the initial burden of demonstrating that they are entitled to summary judgment. *Id.* at 323, 106 S.Ct. 2548. Once this burden is met, the non-moving party must designate specific facts to support or defend its case. *Id.* at 322–24, 106 S.Ct. 2548.

In analyzing whether a question of fact exists, a court will construe the evidence in the light most favorable to the party opposing the motion. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A defendant moving for summary judgment may satisfy this initial burden by pointing to a plaintiff's failure to introduce sufficient evidence to support any essential element of the cause of action alleged. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

■ The legal claim brought here is for deliberate indifference, which is a particular subset of those forms of cruel and unusual punishment prohibited by the Eighth Amendment. The plaintiff in such a case must demonstrate two things. First, "that her condition was serious," which is an objective standard. *Dunigan v. Winnebago County,* 165 F.3d 587, 590 (7th Cir.1999). A condition is "serious" if "the failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain." *Gutierrez v. Peters,* 111 F.3d 1364, 1373 (7th Cir.1997). Second, the plaintiff must show that each defendant acted with the "deliberately indifferent" culpable state of mind, which is a subjective standard. That is, state officials are deliberately indifferent if they know of and disregard "an excessive risk to inmate health or safety;" they must both be "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and [they] must also draw the inference." *Dunigan,* 165 F.3d at 591, *quoting Farmer v. Brennan,* 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994).

■ Thus, the first question which must be answered is: was plaintiff's condition "serious" for Eighth Amendment purposes? That is, could the failure to treat the plaintiff's condition (i.e., pre-birth, birth, and post-birth) have resulted in significant injury or the unnecessary and wanton infliction of pain? *Gutierrez,* 111 F.3d at 1373. I conclude that Doe's condition was, in fact, serious. As the Seventh Circuit noted in *Gutierrez,* "serious" can mean that the condition is one which "a reasonable doctor or patient would find important and worthy of comment or treatment". *Id.* Having medical assistance immediately preceding and during a birth is, in today's society, taken for granted. This is why the prison had a policy of taking women to St. Agnes Hospital for births. As the defendants do not seriously contest the issue of medical seriousness, I can move on to the issue of the defendants' culpable mental state, which requires an analysis of the allegations against each defendant.

### 1. The Nursing Defendants

■ Once again, the second part of the deliberate indifference equation requires that the defendants both be "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and [they] must also draw the inference." *Dunigan,* 165 F.3d at 591, *quoting Farmer v. Brennan,* 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). Nurse Engelmann is implicated because she never checked the plaintiff personally when informed that the plaintiff

thought her water broke. And when she performed the test on the plaintiff's pants, it was four hours after the fact and the pants were dry. Nurse Vande Kolk–Stamm is alleged to have been deliberately indifferent for her treatment of the plaintiff in wrongly assessing Doe to be having Braxton Hicks contractions and not in actual labor. Similarly, Nurse Rockow's actions and omissions (for instance, not sending the plaintiff to the hospital) are alleged to be evidence her deliberate indifference to the plaintiff's medical condition. Finally, Nurse Hebel was also deficient in his treatment of Doe because he should have recognized that the plaintiff was in labor. He also left her while she was in obvious pain (immediately preceding the delivery) and he never reviewed the plaintiff's medical chart. Finally, all of the nurses are alleged to have been deliberately indifferent because they only examined the plaintiff through the small tray slot in the cell door, rather than conducting a more comprehensive exam.

The recurring theme of the allegations against the defendant nurses is that they dropped the ball so egregiously that the only reasonable explanation is that they knowingly disregarded the risks to the plaintiff. That is, their treatment errors were so beyond the pale that a jury could conclude that they were not errors at all, but intentional or reckless actions. This argument relies largely on the opinion of the plaintiff's expert witness, a professor of nursing at Marquette University in Milwaukee. One example from her report should suffice:

> All the symptoms presented by the plaintiff indicated the need for her immediate transport. These include patient feeling rectal pressure, vaginal discharge with some blood, pulse increasing, pain increasing, vomiting.... *Any nurse eligible for licensure in the State of Wisconsin would have known to send this patient to the hospital based on these signs and symptoms that labor was progressing and the patient needed monitoring and professional care only available in a hospital setting.*

(Tobin Report at 8; italics added.)

While the nurse defendants argue that there is no evidence to suggest that they were deliberately indifferent, what they really mean is that there is no *direct* evidence of their subjective mental state. That is, no one heard any of the nurses say, "let's all delay treating Jane Doe so that she suffers." The lack of direct evidence is not surprising, however, as most claims involving a mental state must be proved without a clear view into the mind of the accused. Instead, such claims commonly rely on a jury's ability to make inferences based on the circumstances involved. Here, the expert's testimony, if credited, will invite the jury to make the first of a series of logical inferences required for the plaintiff to win her case. Specifically, the expert will testify that any nurse would have known that the plaintiff was in labor. The jury could then connect the dots and find that, because the defendants are nurses, they must have known that the plaintiff was in labor. A jury could proceed to find that some, or all, of their actions constituted deliberate indifference. Thus, while the defendants are correct that the expert nursing witness cannot testify to the ultimate legal issue of deliberate indifference, she can certainly present testimony from which a jury could reasonably conclude that the performance of the nursing staff was so far below acceptable standards that the behavior of any given nurse was deliberate. Accordingly, construing the evidence in the light most favorable to the plaintiff, I conclude that a reasonable jury could find in the plaintiff's favor. I therefore will deny the motion for summary judgment as to the nursing defendants.

## 2. The Security Defendants

In addition to the nurses, Doe alleges that four of the security staff acted maliciously towards her before and after the delivery. Sgt. Noyans worked second shift in the Segregation Unit from 2 p.m. to 10 p.m. on April 21. Although he testified that he had no recollection that Doe was experiencing problems in her cell in Segregation, there is other evidence from which jurors could conclude otherwise. Following one of her vomiting episodes prior to delivery, Sgt. Noyons is alleged to have called Doe a "dumb bitch" and threatened to make her clean up her cell if she vomited again. Lt. Reese is alleged to have engineered the circumstances that got Doe placed in segregation to begin with. Specifically, Doe alleges that Reese intentionally told her when her induced delivery would be (April 25) so that Doe would become a security risk and need to be placed in "seg". Sgt. Camp refused to let Doe go to the hospital and denied her request for nursing assistance and pain medication and then told Doe to stop using the emergency buzzer. She also refused to allow Doe to have sanitary pads and ice following the delivery. Sgt. Rawson is alleged to have heard Doe's frequent cries of pain and to have consistently minimized the situation, even while other inmates were calling out for Doe to be allowed to go to the hospital. She is also alleged to have allowed four hours to pass between the time Doe's water broke and the time the Nurse Engelmann came to test the pants for amniotic fluid.

Dismissal on summary judgment is unwarranted as to any of these defendants. As to each, there is evidence in the record from which a jury could reasonably find that he or she deliberately ignored Doe's medical condition and suffering. A jury could find that these defendants were aware that the plaintiff was in pain and might be going into labor, and that in failing to assist her they knowingly subjected her to a substantial risk of harm.

## 3. Supervisor Defendants

Finally, the plaintiff has sued Capt. Jeanette Gustavus and nursing supervisor Holly Meier. Gustavus is alleged to be involved in the decision to put Doe in seg on the trumped-up grounds that Doe was a security risk. Gustavus also accused Doe of pushing the baby out on purpose (in order to get out of seg). Placing a prisoner in seg is not, in itself, cruel and unusual punishment. But putting a late term pregnant woman in seg is something different, and a jury could find that it was part the plan of Gustavus and Lt. Reese to ignore Doe's medical condition and to make life as difficult as possible for Doe, so difficult in fact that their actions resulted in cruel and unusual punishment. A jury could find that these actions constituted deliberate indifference, particularly when it is alleged, as here, that the defendants based their decisions on an animus against the plaintiff. *See Walker v. Shansky*, 28 F.3d 666, 673 (7th Cir.1994)(plaintiff "raised an issue of fact as to whether the duration and conditions of his segregation were justified. A jury might find that Walker's prolonged term of segregation combined with the deprivations and abuse alleged in his affidavit constitute unconstitutional conditions of confinement.")

Nurse Meier, the nursing supervisor at TCI, is alleged to have "deliberately turned a blind eye to the need for training the nursing staff in needed skills and therefore failed to train her nurses how to evaluate a contraction, how to time contractions, how to assess whether the bag of waters has broke," etc. (Pltf. Brief at 20.) Thus, in light of the faulty training given to nurses at TCI, it was "all but certain" that the nursing staff would fail to recognize that a birth was imminent. (Pltf.

Brief at 21.) Once again, this argument is based largely on the testimony of the plaintiff's expert witness.

■ I find that this failure-to-train claim cannot withstand the summary judgment motion. First, the expert's opinion is inconsistent with the plaintiff's theory of the case on all of the other care-related claims. The nexus of those claims was *deliberate* indifference. The expert's opinion was that the care given by the defendant nurses was so deficient that it could *not* be the result of simple negligence or even incompetence, but rather must have been a series of intentional acts of *knowing* disregard for Doe's condition. For those claims to succeed, the plaintiff must show that the defendants actually drew the inference that the plaintiff's health was in danger. *Dunigan,* 165 F.3d at 591. Thus, it is inconsistent for the expert to now argue that the nurses' training was deficient, because this undercuts their required culpable mental state for deliberate indifference. If poor training was the cause here, then the nurses are not liable because they never drew the necessary inferences.

The inconsistency does not end there, however. The expert's opinion, again, is that any nurse licensed in Wisconsin would have known that Doe was in labor and about to give birth, and they would have known to examine her more fully and send her to the hospital. That is, it was so obvious that she was in labor that their failure to treat her adequately must have been deliberate. But if it really would have been obvious to any licensed nurse, then there would be no reason for Meier to create the protocols of training suggested by the plaintiff because any licensed nurse would have been able to treat the plaintiff adequately without any additional training.

But even apart from the inconsistencies noted above, the evidence presented here against Meier is insufficient to support the plaintiff's failure to train theory of deliberate indifference. Prior to the incident giving rise to this suit, there is simply no evidence that additional training was an obvious need. As the Eleventh Circuit has put it:

> Failure to train can amount to deliberate indifference when the need for more or different training is obvious, such as when there exists a history of abuse by subordinates that has put the supervisor on notice of the need for corrective measures, and when the failure to train is likely to result in the violation of a constitutional right.

*Belcher v. City of Foley,* 30 F.3d 1390, 1397–98 (11th Cir.1994) (citations omitted). Further, as the Fifth Circuit has observed, if the need for training was "so obvious," the plaintiffs would likely be able to point to other instances of harm arising from the failure to train. *Conner v. Travis County, et al.,* 209 F.3d 794, 797 (5th Cir.2000.) There is no evidence here of a pattern of deliveries by women at TCI in segregated confinement or evidence of nurses frequently missing the signs of labor. Indeed, the plaintiff's expert's testimony is that the lack of care given to the plaintiff was so sub-par as to be exceptional, and it is even noted that the warden at TCI apologized to the plaintiff. Clearly, this was a highly unusual occurrence. As such, it is difficult to say that it would have been obvious to Meier that more nurse training was required. Accordingly, in light of the deficiencies in the evidence presented, summary judgment will be granted in favor of defendant Meier.

**4. Qualified Immunity**

■ Finally, the defendants make an attempt to assert that all of the above allegations, even if true, are barred by the qualified immunity that the defendants enjoy as state actors. But qualified immunity does not insulate state actors from vio-

lations of clearly established law. As the Seventh Circuit has noted, the Eighth Amendment prohibition against deliberate indifference to a prisoner's medical needs has been clearly established since the Supreme Court's 1976 decision in *Estelle v. Gamble*, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). *See Walker v. Shansky*, 28 F.3d 666, 670 (7th Cir.1994)("Because the law here was clearly established, the defendants cannot avail themselves of the qualified immunity defense against alleged violations of the Eighth Amendment.") Thus, I do not find that qualified immunity applies here.

The defendants also suggest that claims against defendants Reese and Gustavus should be dismissed because their decision to place Doe in segregated confinement was rationally related to a legitimate institutional objective. This argument is misplaced, however, as is evidenced by the defendants' reliance on two due process and equal protection cases, *Bell v. Wolfish*, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979)(a case involving a pretrial detainee) and *Thielman v. Leean*, 140 F.Supp.2d 982 (W.D.Wis.2001)(involving an involuntarily committed "sexually violent person"). Here, the allegations are based on the defendants' deliberate indifference to the plaintiff's medical condition-an Eighth Amendment claim-the analysis of which is at odds with any kind of rational basis analysis under either the Due Process or Equal Protection clauses. Thus, I do not find the defendants' immunity or rationality arguments persuasive.

## 5. Conclusion

Except as to defendant Meier, I find that genuine issues of material fact remain in this case and the resolution of those facts is, of course, the province of the factfinder. Therefore, for the reasons set forth above, **IT IS ORDERED** that the defendants' motion for summary judgment is **GRANTED** as to defendant Meier, and **DENIED** in all other respects.