165 F.3d 587
 Latoyia Y. DUNIGAN, Ladesha R. Dunigan, and Isaiah Vance, by
his mother, Cynthia NYMAN, Plaintiffs-Appellants,
and
Estate of L.T. Vance and Marie Coleman, Appellants,
v.
WINNEBAGO COUNTY, Robert Kraus, formerly Winnebago County
Sheriff, Thomas Makurat, Officer, et al.,
Defendants-Appellees.
 No. 97-3232.
 United States Court of Appeals,
Seventh Circuit.
 Argued Oct. 27, 1998.
Decided Jan. 19, 1999.
 
 John C. Peterson, Mary T. Lokensgard (argued), Robinson, Peterson, Berk & Cross, Appleton, WI, for Plaintiffs-Appellants.
 Charles H. Bohl, Kathryn M. West (argued), Elizabeth M. Estes, Whyte Hirschboeck Dudek, S.C., Milwaukee, WI, for Defendants-Appellees.
 Before CUMMINGS, CUDAHY and FLAUM, Circuit Judges.
 CUDAHY, Circuit Judge.
 
 
 1
 L.T. Vance died while imprisoned in the Winnebago County Jail (WCJ). His survivors (the plaintiffs) and estate sued various county officials (the defendants) under 42 U.S.C. § 1983 alleging that the officials' failure to administer proper medical care constituted cruel and unusual punishment in violation of the Eighth Amendment. The district court granted the defendants' motion for summary judgment and the plaintiffs appeal that order. The lack of sufficient probative evidence from which a jury could infer deliberate indifference to Vance's serious medical condition determines the outcome. We affirm.
 
 I. Background
 
 2
 On July 6, 1994, the Winnebago County authorities arrested L.T. Vance and locked him up at the WCJ. Vance's medical care, administered by a team of medical personnel, began immediately. During the standard medical screening intake interview, Vance informed a WCJ nurse that his vision was blurry as a result of a car accident several weeks before. The nurse conducted a thorough examination of Vance and took copious notes on his condition. On July 11, Vance renewed his complaints of double vision and headaches. Nurse Gaertner, the full-time WCJ nurse practitioner, referred Vance to Dr. Krieger, the WCJ doctor.[1] Dr. Krieger examined Vance on July 14 and ordered a CT scan. The CT scan, conducted on July 22, came back normal.
 
 
 3
 Vance was moved to another jail at the end of July but returned to the WCJ on September 6. Upon his return, Vance complained of headaches, double vision, muscle fatigue and reduced strength in his arms, saying he felt "like things are getting worse." That same day, Nurse Gaertner consulted with Dr. Krieger, who recommended that Vance see a neurologist. On September 9, Dr. Haffar, a neurologist, conducted an initial neurological examination of Vance. He determined that further inquiry was appropriate and himself administered a series of more specialized tests on September 21. The results were all normal.
 
 
 4
 On October 1, Vance fell and cut his head. Dr. Krieger promptly treated him for the injury. Vance went back to Dr. Haffar on October 6 for a follow-up visit. Dr. Haffar tentatively diagnosed Vance with myasthenia gravis (MG). MG is a disease "marked by abnormal fatigability and weakness of the muscles," especially the ocular muscles, which often results in double vision and droopy eyelids. 6 A TTORNEY'S T EXTBOOK OF M EDICINE §§ 23.140-23.142 (Roscoe N. Gray & Louise J. Gordy, eds., 3rd ed.1998). MG's symptoms are intermittent; a sufferer may experience periods of extreme weakness followed closely by periods of normal strength. The symptomology can be so variable that lay people unfamiliar with MG might conclude that a sufferer was faking illness. See J.E. SCHMIDT, 4 ATTORNEY'S DICTIONARY OF MEDICINE AND WORD FINDER M-302 (1998) (MG "might be mistaken for ... hysteria"). Dr. Haffar believed that Vance had the mildest form of MG--Ocular MG--which would cause Vance's eyelids to droop but would not affect his breathing. He prescribed Mestinon, a drug commonly used to treat MG, and asked to see Vance again in three months. The WCJ medical staff did not know of Dr. Haffar's diagnosis, nor were they familiar with typical symptoms of MG.
 
 
 5
 For the next five weeks, Vance's condition fluctuated dramatically and frequently between periods of normal strength and periods of severe weakness. He saw Nurse Gaertner frequently during this period, and she in turn consulted with Dr. Krieger, who examined Vance and recommended that he be housed in a receiving cell for observation. One three-day stretch well illustrates Vance's variable condition. On October 24, Vance felt strong enough to request that he be returned to the general population so that he could watch television. Nurse Gaertner noted that he was doing exercises in his cell and did not complain about dizziness. Her log states: "will move back to gen. population [...] if gait is observed as being unsteady will reevaluate again for safety, running log kept in module of activity and videotaped." That same evening, Officer Ron Timm went to transfer Vance to the general population. Vance was unable to carry his personal effects, walked very slowly and eventually collapsed on his way to the general population cell block. Officer Timm, who only heard but did not see the fall, immediately checked Vance for injuries, found nothing wrong and brought Vance back to the receiving cell where he could be easily monitored. Officer Timm arranged for checks on Vance every fifteen minutes. The next day, October 25, Nurse Gaertner called Dr. Haffar about Vance's continued problems with dizziness and unsteadiness, but further noted that Vance was moving from a sitting position to a standing position and removing his uniform without any difficulty. On October 26, Nurse Gaertner spoke with Dr. Haffar about Vance's condition. Dr. Haffar recommended continuing the course of Mestinon medication and close observation. Again, Nurse Gaertner (and everyone else at the WCJ) did not know of Dr. Haffar's diagnosis of Vance's condition or the typical symptoms of MG.
 
 
 6
 Vance's variable symptomology continued into November. Nurse Gaertner noted in a medical log entry on November 1 that Vance complained about not being able to move from a sitting to a standing position. On November 3 she observed Vance on camera sweeping and mopping his cell. On Tuesday, November 8, Nurse Gaertner asked to see Vance in the nurse's office. When Vance felt unsteady on his feet, Nurse Gaertner went to his cell to examine him. He claimed he did not feel well and exhibited weak hand strength but normal leg strength. The next day, November 9, Officer Thomas Makurat found Vance lying on his cell floor with his head resting on his bunk. Vance claimed that he had fallen and hurt his neck. Officer Makurat called for assistance and Officer Reeves responded. Neither officer could find any injuries, and Vance moved his arms and legs easily. The officers arranged for close observation from the control module. That same day, Nurse Gaertner, suspecting that Vance's condition might be at least in part psychosomatic, consulted with Dr. Krieger about getting Vance an independent psychological examination. The next day, November 10, another nurse followed up to determine when and where Vance could be examined. After consulting with Dr. Krieger about the urgency of the situation, she arranged an appointment for Vance on the following Monday, November 14.
 
 
 7
 On Friday, November 11, Vance defecated in his uniform. He claimed to be too weak to get to the toilet but was later observed moving about his cell without difficulty. The next day Vance again defecated in his uniform and then collapsed on his way to the showers. Officers Folletz and Scovronski could find no injuries and helped Vance into a chair. Officer Folletz then supervised Vance's seated shower, returned Vance to his cell and brought him cleaning equipment and fresh linens. Officer Folletz checked back on Vance numerous times during his shift. The video camera later recorded Vance getting dressed, exercising on his bed, standing and sitting without difficulty and cleaning his cell area.
 
 
 8
 On Sunday, November 13, the camera again recorded Vance's normal behavior. He ate breakfast, went to the bathroom and exercised his arms freely. Officer Folletz distributed Vance's medication at 7:30 and 11:30 that morning and reported that Vance said he felt "okay." At 1:45 that afternoon, Officer Folletz observed Vance singing along with his radio; Officer Folletz encouraged Vance to "keep it up." At 4:30 that afternoon, Vance did not take his medication. Later that evening, at about 11:00, Officer Makurat was passing out medications to inmates and noticed that Vance was extremely lethargic. Officer Makurat had to help Vance to sit up on his bunk; he never saw whether Vance took this round of medication.
 
 
 9
 Sometime between 2:30 and 3:30 on the morning of Monday, November 14, the control module clerk, Sean Eddy, observed Vance sitting on the edge of his bunk swinging his legs back and forth. This was not unusual. Shortly thereafter, Vance's condition took a turn for the worse. At about 4:30, Officer Anthony Mann was on routine security rounds when he noticed that Vance was lying in an odd position on his bunk. When Officer Mann passed by about 45 minutes later, Vance had not moved. Officer Mann entered the cell, found Vance unresponsive and immediately radioed for help. A second guard, Officer Christine Hughes, responded and directed another WCJ employee to call 911. Officers Hughes and Mann administered CPR until paramedics arrived. Vance was taken by ambulance to the Mercy Medical Center in Oshkosh where efforts to resuscitate him proved unsuccessful. He was pronounced dead at about 5:45 a.m. on November 14, 1994.
 
 
 10
 Vance's survivors brought a claim under 42 U.S.C. § 1983 alleging that the WCJ and its officers had violated Vance's Eighth Amendment rights by depriving him of necessary medical care. Experts hired by both parties agreed that Vance suffered from MG but disagreed on whether this condition significantly contributed to his death. The defendants moved for summary judgment. The district court held that to survive summary judgment, the plaintiffs had to show evidence that the defendants acted with a sufficiently culpable state of mind. Because they could not produce "significantly probative evidence of such a state of mind," the district court granted the defendants' summary judgment motion.
 
 II. Analysis
 
 11
 We review a district court's grant of summary judgment de novo, applying the same standard as the district court and viewing the record and all reasonable inferences to be drawn from it in the light most favorable to the non-moving party. See, e.g., Forbes v. Edgar, 112 F.3d 262, 265 (7th Cir.1997).
 
 
 12
 In an Eighth Amendment claim of inadequate medical care in a prison, a plaintiff must show that a responsible state official was deliberately indifferent to his or her serious medical condition. See, e.g., Farmer v. Brennan, 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994); Gutierrez v. Peters, 111 F.3d 1364, 1369 (7th Cir.1997). This standard erects two high hurdles, which every inmate-plaintiff must clear. First, a plaintiff must show that her condition was serious, an objective standard. A condition is serious if "the failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain." Gutierrez, 111 F.3d at 1373 (citation and internal quotations omitted). Second, a plaintiff must show that a state official acted with the requisite culpable state of mind, deliberate indifference, a subjective standard. State officials are deliberately indifferent if they "know[ ] of and disregard[ ] an excessive risk to inmate health or safety; the official[s] must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and [they] must also draw the inference." Farmer, 511 U.S. at 837, 114 S.Ct. 1970. Here, the parties do not contest the seriousness of Vance's medical condition. This case therefore turns on whether there was a genuine issue of fact about whether the defendants were deliberately indifferent to Vance's serious medical condition.
 
 
 13
 The plaintiffs argue that two facts are probative of the defendants' deliberate indifference. First, the plaintiffs focus on what they characterize as Vance's "rapid deterioration" during the final days of his life. Specifically, they point to Vance's incontinence and the defendants' failure to consult medical personnel when faced with this deteriorating condition. Second, the plaintiffs assert that the defendants' failure to actively administer Vance's medication to him, especially on the afternoon and evening of November 13, is also probative of their culpable state of mind. They argue that this failure illustrates a knowing disregard for a serious threat to Vance's health. The plaintiffs claim that these facts are enough to get their case to a jury.
 
 
 14
 These arguments are not persuasive. The plaintiffs, in effect, ask us to ignore the bulk of the WCJ's three-month record of treating Vance's medical condition and to focus exclusively on the final weekend of his life. Our review of the facts is not so limited: "we must examine the totality of an inmate's medical care when considering whether that care evidences deliberate indifference to his serious medical needs." Gutierrez, 111 F.3d at 1375. Viewing the entire record, the plaintiffs cannot show significantly probative evidence either that the defendants knew of a serious medical risk to Vance or that the defendants disregarded such a risk. Thus, the plaintiffs' factual highlights are not enough and summary judgment was appropriate. Mistreatment for a short time might in some circumstances be evidence of a culpable state of mind, but the facts here do not justify such a conclusion.
 
 
 15
 There is no direct evidence that WCJ officials knew about the seriousness of Vance's condition or the risks associated with MG. Dr. Krieger, Nurse Gaertner and the medical officers were unaware that Vance had MG. None of the officers or the nurses had ever been instructed in the treatment of and dangers from this rare disease. Dr. Haffar claims he sent a letter to Dr. Krieger on October 6 (after the specialized neurological tests) in which he stated his tentative diagnosis. Nurse Gaertner, however, states that Dr. Haffar did not forward the letter until after Vance's death. Whatever the case, Dr. Haffar suspected that Vance had only the mildest form of MG, Ocular MG, and perceived no serious threat to Vance's health. So even if Dr. Krieger or Nurse Gaertner had been aware of Dr. Haffar's tentative diagnosis, there is no direct evidence from which a jury could conclude that any of the defendants was aware of any serious risk to Vance's health.
 
 
 16
 The indirect evidence that the defendants actually knew of a substantial risk of serious harm to Vance is also insufficiently probative. A series of negligent acts might be some evidence of either a plaintiff's exposure to a serious risk or an official's awareness of such exposure, see Sellers v. Henman, 41 F.3d 1100, 1102-03 (7th Cir.1994), but showing deliberate indifference through a pattern of alleged neglect entails a heavy burden. See id. (series of negligent acts does not constitute deliberate indifference); Gutierrez, 111 F.3d at 1374-75 (isolated incidents of neglect during an otherwise continuous stretch of adequate medical care is insufficient to support an inference of deliberate indifference). And again, a court must examine the entire record, not just isolated events. See Gutierrez, 111 F.3d at 1375.
 
 
 17
 The plaintiffs suggest that Vance's falls and incontinence on November 11 and 12 are evidence of a deteriorating condition which should have alerted WCJ staff to a serious risk to Vance's health. But Vance's medical condition, although arguably worse, was not clearly different from his health pattern during his entire incarceration. Consistent with typical MG symptoms (symptoms unknown to anyone at the WCJ), Vance's condition was wildly sporadic, varying not only day-to-day but hour-to-hour. He was, for example, too weak to get himself to the toilet or stand in the shower on the morning of November 12 but strong enough to clean his cell, do arm exercises and sing along with the radio on the same afternoon. Moreover, he had fallen several times before, never suffering a serious injury, and there is no evidence that incontinence is indicative of a serious threat to his health. Thus, the plaintiffs' selective factual focus only underscores the weakness of their case. They can not point to a pattern of neglect from which a jury could infer that the defendants knew of a serious risk to Vance's health. Indeed, Vance's variable condition during his stay at the WCJ undercuts any reasonable inference that the defendants knew of such a substantial risk.
 
 
 18
 There is also a lack of sufficiently probative evidence that the defendants, even if they did know of the risk of harm, disregarded that risk. The plaintiffs argue that the officials' failure to call in medical personnel on November 12 and 13 illustrates a disregard for a serious risk. They make a similar assertion about the defendants' failure to ensure that Vance swallowed his Mestinon. Contrary to the plaintiffs' claims, WCJ officials were anything but inattentive. The record instead reflects that WCJ officials were continually solicitous of Vance's medical needs. For most of his stay at the WCJ he was housed in a receiving cell so that he could be closely observed. Over the course of Vance's incarceration at the WCJ and in response to his health complaints, he was repeatedly examined by staff nurses and the jail's doctor, Dr. Krieger. Dr. Haffar, a neurologist, examined Vance several times. The WCJ guards were similarly responsive to Vance's needs, helping him sit up and alerting each other and the medical staff to Vance's complaints. A WCJ policy prohibited the guards from actively administering the medications (that is, forcing Vance to swallow his pills). And, in any event, Vance had not taken his medication four times before without serious consequence. In Vance's final days, the staff remained attentive to Vance's health. They had arranged for a psychiatric exam for the day he died and regularly monitored his condition over his last days. Thus, there is no evidence from which a jury could reasonably infer that WCJ officials disregarded a serious risk to Vance's health. Again, his final days, when viewed in light of his entire stay, were not markedly atypical, and although the defendants' treatment of Vance during those days fell short, there was no clear indication of lack of concern.
 
 
 19
 We agree with the district court that some facts of this case--particularly Dr. Haffar's apparent failure to inform WCJ staff about the disease and his apparent misdiagnosis of the severity of Vance's condition--are troubling. But this possible evidence of negligence or malpractice does not implicate constitutional concerns. See, e.g., Soto v. Johansen, 137 F.3d 980, 981 (7th Cir.1998) ("mere negligence or even gross negligence does not constitute deliberate indifference") (internal quotations and citation omitted); Forbes, 112 F.3d at 266-67 (prisoners are entitled to only "reasonable measures to meet a substantial risk of serious harm;" even medical malpractice does not rise to the level of an Eighth Amendment violation). An Eighth Amendment claim requires much more. The plaintiffs have not produced sufficiently probative evidence that WCJ officials were deliberately indifferent to L.T. Vance's serious medical condition. They can not show that the defendants knew of and disregarded a risk of serious medical harm to Vance and the case therefore is A FFIRMED.
 
 
 
 [1]
 Dr. Krieger spent at least six hours per week at the WCJ and was on-call at all times. In addition to Nurse Gaertner and Dr. Krieger, the WCJ medical team included other nurses and referral physicians. Every shift also had a guard who served as the "medical officer." This guard had undergone special training and worked closely with the medical staff on health care matters