In the
United States Court of Appeals
For the Seventh Circuit

No. 99-3180

TOBY R. CHAVEZ,

Plaintiff-Appellant,

v.

GILBERT "GIB" CADY, JANE BATTLES,
DON FULTON, BOB STRAIGHT, JOE FAMELLI,
and TOM SHOEMAKER,

Defendants-Appellees.

Appeal from the United States District Court
for the Central District of Illinois.
No. 98 CV 4089--Joe B. McDade, Chief Judge.

Argued February 16, 2000--Decided March 22, 2000

Before KANNE, DIANE P. WOOD, and EVANS, Circuit
Judges.

EVANS, Circuit Judge. Toby Chavez, arrested for
possession of marijuana with intent to deliver,
was held in the Henry County jail from May 1996
until May 1997 when he pled guilty to the charge.
He alleges that while in the jail he suffered
from a serious medical need--he had a perforated
appendix--and that the defendants were
deliberately indifferent to his condition, in
violation of the Fourteenth Amendment to the
United States Constitution. He sued under 42
U.S.C. sec. 1983, naming as defendants Gilbert
Cady, the sheriff; Robert Streight, the jail
administrator; Joseph Femali, Don Fulton, and Tom
Shoemaker, correctional officers; and Jane
Battles, a nurse practitioner who was supervisor
of the jail clinic./1

The district court granted summary judgment to
the defendants, a decision which we review de
novo. Summary judgment is proper only when there
is no genuine issue of material fact and the
moving party is entitled to judgment as a matter
of law. Rule 56, Federal Rules of Civil
Procedure. We must construe the facts in the
light most favorable to the nonmoving party and
draw all inferences in his favor. Holtz v. J.J.B.
Hilliard W.L. Lyons, Inc., 185 F.3d 732 (7th Cir.

1999).

The facts show that the Henry County jail does not have its own written manual of policies for the operation of the jail; it follows the Illinois County Jail Standards, which are issued by the Illinois DOC. During the relevant time, when a detainee complained of an illness, the usual procedure was that a correctional officer prepared a form for the jail nurse, who came in once a week for sick call. The detainee would see the nurse on sick call. If the illness was serious, the officer could call a Health Department nurse or a hospital emergency room. If the illness seemed to present an emergency, the officer contacted the senior deputy on duty so that a decision could be made as to whether to take the detainee to the hospital.

After dinner on Monday, October 21, 1996, Chavez, who all agree had never caused problems at the jail, had severe stomach pain; he was vomiting, he was sweating, had chills, and said that he wanted to go to the hospital. He was placed in a holding cell for observation. Femali called a nurse (presumably the public health nurse or an emergency room nurse), who said that if the symptoms worsened, Chavez should be taken to an emergency room. As the nurse instructed, Chavez was given an aspirin, which he vomited immediately. Femali recorded information about Chavez in the jail log book so that the next shift would know what was going on. During this period, Chavez says that his stomach hurt so badly that he was curled up in a ball on the floor. He continued to vomit and later to have dry heaves. He asked again during the night to go to the hospital, but he was kept in the holding cell. The next day the dry heaves stopped but, still in pain, Chavez asked Streight, who was now on duty and who had read the log book, if he could see a doctor. Streight said the nurse would be on duty on the 23rd and Chavez could see her then. Chavez was moved back to his regular cell. On the 23rd, in fact, Chavez saw nurse Battles and told her of his symptoms. She asked about diarrhea and Chavez said that, to the contrary, he had not had a bowel movement for a couple of days. Battles told him he had the flu and would be put on a diet of soup and crackers. She also noted that he should be given one Ex-Lax. She said that if his symptoms increased he should see a doctor. The medical reports the nurse prepares after she sees detainees are available for review by the correctional officers.

The same general pattern continued from the 24th though the 30th. Chavez felt sick and was not eating properly and, in fact, may not have been provided the diet the nurse ordered. On the

24th he again received an Ex-Lax, still with no positive results. He continued to ask to see a doctor. On the evening of the 27th, when he asked to see a doctor, Femali told him he had to see the nurse first. He asked again the next morning, the next evening, and on the following days to see a doctor or a nurse. Finally, on October 30, he saw nurse Battles, who, because he had not yet had a bowel movement, said he should have more fluids and that she would given him a stronger laxative, Dulcolax, one time only. Echoing her words of a week earlier, she said that if the Dulcolax did not provide relief he should be referred to a doctor. That evening Chavez asked Shoemaker for the Dulcolax; Shoemaker looked for the laxative but there was none available. Amazingly, Shoemaker said that he understood that mineral oil would work and he gave it to a somewhat reluctant Chavez, who claims that Shoemaker said if he did not take the mineral oil he would be refusing medical treatment.

On the morning of October 31, because Chavez did not see a guard on his cellblock, he called his lawyer's secretary to ask her to call the jail to have them send one to see him. Fulton responded and, although Chavez did not want more laxative because he did not think it would do any good, and although the nurse had not authorized it beyond the one time on the 30th, Fulton gave him two Dulcolax tablets at about 10:40 a.m. Around 5 p.m., Chavez told Femali that the Dulcolax had not worked and he wanted to go to a hospital. At about 9:30 p.m. Femali called the Kewanee Hospital emergency room and told a nurse that Chavez had not had a bowel movement in 10 days. She said to give him more Dulcolax but, as it turns out, there was none available in the jail. Finally, Femali recommended that Chavez be taken to the emergency room. Chavez was then taken to the Hammond-Henry Hospital in Geneseo.

In the emergency room, Dr. Lekha Prasad examined him. At this time Chavez was complaining of diffuse abdominal pain, especially in the suprapubic region. He said he had pain after he urinated and that he had had chills for 3 to 4 days. Dr. Prasad said in her report that Chavez did not appear to be in acute distress, though he looked ill. He had a mild fever. Blood tests revealed a very high white blood count. Dr. Prasad concluded that Chavez had a urinary tract infection, which she now admits was a misdiagnosis.

Chavez's condition deteriorated overnight in the hospital, causing Dr. Prasad to change her diagnosis to possible appendicitis. She called Dr. Yogin Parikh for a consultation. His rectal examination of Chavez showed "bogginess," which

suggested an abscess. Dr. Parikh's impression was that Chavez most likely had an acute appendicitis perforation with an appendiceal abscess. Dr. Parikh did an exploratory laparotomy on November 1. The post-operative diagnosis was that Chavez had an appendicular abscess and a perforated appendix. Chavez was released on November 7, with no further medical problems. He contends, however, that because of his deteriorated condition the surgery lasted longer than normal, and he had to have a tube down his throat for 4 days, which increases the risk that he may develop adhesions.

The district judge found that Chavez had a serious medical need and expressed his dismay at how the correctional officers treated Chavez. But he concluded that Chavez had not shown that, subjectively, the guards knew of the risk Chavez faced and that the danger was not so objectively great that actual knowledge of the danger could be imputed to them. As to Battles, Chavez could not show that her treatment constituted a substantial departure from accepted professional judgment. The judge interpreted the claim against Sheriff Cady as being either a policy or procedure claim or a respondeat superior claim. He found that Chavez did not present evidence as to the former and that the latter, of course, does not apply.

On appeal, the defendants' argument is, first of all, that while appendicitis is a serious medical need, there was no indication until Chavez was in the hospital that he, in fact, suffered from appendicitis or any other serious medical need. They argue that the nurse exercised professional judgment (or at least Chavez has not shown she did not); the correctional officers were simply following her lead; and in any case, the officers did not have subjective knowledge regarding Chavez's condition which would render their treatment of him deliberately indifferent and therefore unconstitutional.

A pretrial detainee's claim alleging inadequate medical care is a Due Process claim. Bell v. Wolfish, 441 U.S. 520 (1979). In general, the claim is analyzed in the same way as a claim under the Eighth Amendment to determine whether the officials showed deliberate indifference to serious medical needs. County of Sacramento v. Lewis, 523 U.S. 833 (1998). "Deliberate indifference" is not self-defining. In Farmer v. Brennan, 511 U.S. 825, 837 (1994), the Court determined that it sets out a subjective, not an objective, standard:

We hold instead that a prison official cannot be found liable under the Eighth Amendment for

denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

As to the correctional officers, this is the standard which applies.

As to a medical professional such as the nurse in this case, however, the analysis is a little different. In Collignon v. Milwaukee County, 163 F.3d 982 (7th Cir. 1998), we pointed out that the professional judgment standard applies in Fourteenth Amendment claims to decisions made by professionals such as physicians and nurses within their area of expertise. But we also said that the Fourteenth Amendment professional judgment standard is "comparable" to the deliberate indifference standard and requires "essentially the same analysis." Collignon, at 988, 989. First, a plaintiff must establish an objectively serious medical need. Then the plaintiff must show "(1) that the professional knew of the serious medical need, and (2) disregarded that need." At 989. The trier of fact can conclude that the professional knew of the need from evidence that it was obvious and, further, it can be assumed that "what might not be obvious to a lay person might be obvious to a professional acting within her area of expertise." At 989.

Defendants provided a medical expert, Dr. Thomas G. Soper, to establish that what nurse Battles did was within the norm. They argue that because Chavez did not offer expert testimony, he cannot prevail on the claim against Battles. However, it seems to us that Dr. Soper's testimony cuts both ways. Certainly it is not so convincing as to require summary judgment for Battles.

Dr. Soper testified that while Chavez's symptoms were like those of the stomach flu, they were also consistent with food poisoning, mesenteric adenitis, gallbladder gastritis, or appendicitis. He found nurse Battles' actions appropriate on October 23rd when she ordered that if Chavez's symptoms worsened he should be taken to the hospital. Then Dr. Soper admitted that his notes show that Chavez's condition worsened during the night, but he testified that, in fact, there was nothing, except Chavez's word, to show that he continued to be in considerable pain or that he was getting worse. From the fact that the only written observations of Chavez are nurses' notes, one page from the 23rd and one from the 30th, Dr. Soper arrives at the somewhat questionable

conclusion that no one else observed that Chavez was in bad shape because if they had, surely they would have done something about it. "I just have to assume in this dang [day and] age that if such a thing occurred that they would at least pick up the phone and make somebody aware that somebody was really getting sicker and sicker." In other words, there could have been nothing wrong because if there had been, someone would have done something about it; no one did; therefore there was nothing wrong. An interesting logical proposition. An opinion based on such a foundation is not a solid basis for a grant of summary judgment.

As to the likely progress of Chavez's illness, Dr. Soper's testimony is as helpful to Chavez as to Battles. The doctor testified that at first Chavez either had an infection in his appendix or an obstruction of the appendix with inflammation. After the appendicitis developed, the appendix ruptured. After the rupture, the abscess developed. Dr. Soper guessed that Chavez's appendix had been ruptured for at least 2 and at the most 7 or 8 days. If that is the case, then Chavez's testimony regarding pain can hardly be considered incredible as a matter of law.

Dr. Soper nevertheless concludes that Battles "complied with the applicable standard of care for a medical professional . . . in her diagnosis and treatment of Mr. Chavez on October 23 . . . ." He said the same of her treatment on October 30. But given the nature of his testimony, we think that an issue of material fact exists as to whether the treatment was a substantial departure from accepted professional judgment. Battles did virtually the same thing on the 30th as she had on the 23rd, even though by then Chavez had suffered for 7 extra days. Battles knew that her order on the 23rd to take Chavez to the doctor if he got worse was not heeded. Why would she assume it would be heeded on the 30th? Dr. Soper's testimony is not sufficient for us to determine that, as a matter of law, Chavez did not have a serious medical need or that he cannot show that the nurse's treatment was a substantial departure from accepted professional judgment.

As to the correctional officers, Chavez must show they were deliberately indifferent to his serious medical needs. The defendants argue that the judge was wrong to conclude that Chavez had a serious medical need prior to October 31. But we know Chavez complained of pain and distress. It turns out that he had a ruptured appendix. Because he also had an abscess, according to Dr. Soper, the appendix had been ruptured for some time. It is hard for us to say as a matter of law that there was no serious medical need.

We also cannot find that, as a matter of law, the officers were not deliberately indifferent to Chavez's condition. The officers cannot hide behind the nurse. Even if her treatment of Chavez had clearly been proper, we know that some of the officers did not follow her directives. The most glaring example is Shoemaker using his own judgment and substituting mineral oil for Dulcolax.

The officers point out that Farmer requires that to be liable they must have subjective knowledge of the seriousness of Chavez's condition. They deny such knowledge and also contend that his condition was not so obviously serious as to require a conclusion that they knew about it. We have some difficulty with this argument as well. Chavez did his part to let the officers know he was suffering. The situation is somewhat analogous to that in Reed v. McBride, 178 F.3d 849 (7th Cir. 1999). There we found that an inmate's letters to officials setting out his medical condition put the officials on notice of his potential problem, and that the question as to whether the officers drew the inference that certain things should be done for the inmate could be determined by a jury on the basis of circumstantial evidence.

This is not a case in which officers have taken so many steps to obtain medical care for a prisoner that their very concern for the inmate rules out a finding of deliberate indifference. See Dunigan ex rel. Nyman v. Winnebago County, 165 F.3d 587, 592 ("WCJ officials were continually solicitous of Vance's medical needs. For most of his stay at the WCJ he was housed in a receiving cell so that he could be closely observed. Over the course of Vance's incarceration at the WCJ and in response to his health complaints, he was repeatedly examined by staff nurses and the jail's doctor, Dr. Krieger. Dr. Haffar, a neurologist, examined Vance several times. The WCJ guards were similarly responsive to Vance's needs . . . ."). It is also not a case clearly involving a relatively minor illness which one can ignore without being found to be deliberately indifferent. Cooper v. Casey, 97 F.3d 914, 916 (7th Cir. 1996) (Refusal to "dispense bromides for the sniffles or minor aches and pains or a tiny scratch or a mild headache or minor fatigue . . . does not violate the Constitution."); Gibson v. McEvers, 631 F.2d 95 (7th Cir. 1980) (failure to treat a common cold does not violate the Eighth Amendment.) Rather, this is a case requiring that inferences be drawn as to what the officers knew. Given the circumstances of this case, that they said they did not know Chavez was seriously ill cannot

carry the day if other evidence would allow an inference that they did know of a serious medical need and that they were deliberately indifferent to it.

Sheriff Cady, however, was properly dismissed from this case. Chavez has not shown that he had anything to do with these events personally nor that the policies are inadequate. In order to be held liable a supervisor must know about the situation and approve of it. He cannot be liable if he is merely negligent in failing to detect and prevent his subordinates' misconduct. See Reed; Jones v. City of Chicago, 856 F.2d 985 (7th Cir. 1988).

Accordingly, the summary judgment decision dismissing Sheriff Cady is AFFIRMED. The decision as to all other defendants is REVERSED and the case is REMANDED to the district court for further proceedings.

/1 The caption lists the defendants as "Straight" and "Famelli" but we used the spelling from the defendants' brief.