KANNE, Circuit Judge.
While incarcerated as a pretrial detainee at the Kendall County jail, Brian Zent-myer contracted an ear infection that he claims led ultimately to permanent hearing loss in his right ear. Zentmyer brought suit under 42 U.S.C. § 1983 against his jailers claiming that they violated his Fourteenth Amendment rights and displayed deliberate indifference to his health in treating his infection. Namely, Zent-myer cites the jail deputies’ failure to administer prescription antibiotics to him on a number of occasions. We affirm summary judgment in favor of the defendants and hold that the defendants’ actions fell short of the deliberate indifference standard for liability under the Fourteenth Amendment.
I. HISTORY
Each morning at the Kendall County jail, deputies check each inmate for medical complaints and register any complaints on a sick call form. Deputies forward emergency complaints directly to the commanding officer, who then decides whether to summon a doctor for immediate care. Routine complaints are recorded for the attention of the jail nurse, who visits twice weekly. If necessary, the nurse may transfer an ailing inmate to a nearby medical facility, request a doctor’s visit or order non-prescription medication for the inmate. As required, deputies dispense medication to inmates in accordance with the nurse’s or doctor’s orders. No particular deputy is designated to give medication to inmates, but instead any deputy on duty at the time is authorized to administer medication as scheduled in the shift log. Jail officials record each inmate complaint, medical examination and administration of medication.
After arresting him for residential burglary, Kendall County police booked Brian Zentmyer into the Kendall County jail as a pretrial detainee on January 22, 1995. Three months later, during the evening of April 18, 1995, Zentmyer complained to Deputy Dave Gawne that he had an earache. Observing no ear discharge, swelling or signs of emergency, Gawne suggested that Zentmyer go on sick call the next morning and reported Zentmyer’s complaint in the shift log, advising the subsequent deputy on duty to notify the nurse. *808 The next morning, Zentmyer followed Gawne’s instruction by asking Deputy Jim Hetzel to place him on sick call and call the nurse. According to jail officials, however, several deputies miscommunicated over the radio, and as a result, Zentmyer was not placed on sick call and did not see Nurse Mariis Schumacher that day. Zent-myer complained to Deputies Chris Pfister and Rick Flowers later that afternoon, but Pfister apologized that the nurse had already left the jail. Pfister gave painkilling medication to Zentmyer and wrote in the shift log that the nurse should examine Zentmyer during her next visit.
On April 20, 1995, Zentmyer again complained to Hetzel, but the nurse had taken a vacation day and was unavailable. The next morning, Zentmyer voiced no complaint when Deputy Tim Walker surveyed the inmates for medical care. However, later that day, Zentmyer told Deputy Charles Walton that he was in pain and asked to see a doctor. Walton checked with Sergeant James Howe who, after consulting Commander Michael Hawkins, ordered the next shift’s deputies to take Zentmyer to the local hospital. Around 10 a.m. on April 22, 1995, Hetzel accompanied Zentmyer to the emergency room of the Sandwich Community Hospital.
Dr. Deenadayal Gaddam noticed inflammation in Zentmyer’s right ear but did not see any swelling, discharge, boils, blockage or other signs of injury. Zentmyer reported no hearing loss and exhibited no signs of inner-ear infection. Gaddam diagnosed Zentmyer as suffering only from otitis ex-terna and otitis media, infections of the outer and middle ear. Gaddam later testified that Zentmyer’s condition, if left untreated over time, could have cleared up by itself but might instead have worsened and led potentially to hearing loss. Gad-dam prescribed the oral antibiotic Amoxi-cillin for the middle-ear infection, to be taken once every eight hours for ten days (eleven days counting the day of prescription), and the antibiotic eardrop Otocort for the outer-ear infection, four drops to be administered to the ear four times daily until the bottle was empty. Gaddam also directed Zentmyer to see a physician in two weeks and take Tylenol for pain or fever. Hetzel and Zentmyer returned to the jail by 11 a.m., less than an hour later.
Gaddam testified later that Amoxicillin must be taken consistently to be effective, but acknowledged that the ear infection would have been treated so long as Zent-myer ingested all thirty pills of Amoxicillin in the days following the prescription, even if not taken every eight hours. Zentmyer received the prescribed dose of Amoxicillin on seven of the eleven days[1] following the hospital visit and eventually took the entire thirty-pill bottle of Amoxicillin. Gad-dam also testified that three applications of Otocort a day would be sufficient for treatment because doctors “prescribe four times hoping [their patients] will take it three times.” Zentmyer received the prescribed doses of Otocort on seven of twenty days following his hospital visit, and received at least three doses on four of the remaining thirteen days during that period. Each day, Zentmyer received at least two painkillers a day in addition to his prescription medication.
Realizing that he was not taking his medication exactly according to prescription, Zentmyer complained to Deputy Pfis-ter on April 27, 1995, and warned that he would sue if he did not receive his medication on schedule. According to Pfister, Zentmyer became “frustrated, seemed upset and started pacing back and forth.” Pfister told him to let the guards know if he needed medical attention, but Zentmyer responded that it was the duty of the deputies to administer medication and his *809 lawyer had advised him not to ask the deputies for medication. As he had been trained, Pfister instructed Zentmyer to address him as “Deputy Pfister” and told Zentmyer that he would be placed in isolation if he kept complaining. When Zent-myer remained agitated, Pfister decided to “[l]et him vent” because “[a]ll inmates vent” and Pfister “didn’t feel that [Zent-myer] needed disciplinary action.” Zent-myer continued venting and threatened, “You just wait, I’m going to get you in court.” Indeed, Zentmyer’s lawyer had already contacted Commander Hawkins to protest Zentmyer’s treatment. As a result, Hawkins investigated by questioning Deputies Pfister, Hetzel and Tara Lamons, but each answered that Zentmyer was receiving medication as prescribed.
Zentmyer also complained about his ear to Flowers on April 26, 1995, to Gawne on May 1, 1995, and to Deputy Sabrina For-man on May 2 and 3, 1995. On May 3, 1995, Nurse Schumacher examined Zent-myer, who complained of an earache, headache and bleeding from the ear. Schumacher noticed no bleeding but found yellow drainage in Zentmyer’s right ear, so she scheduled a visit by Dr. Jose Trevino for two days later. Trevino found that the middle-ear infection had healed, but diagnosed Zentmyer as still suffering from an outer-ear infection and prescribed the antibiotics Biaxin and Elocon, each to be taken twice daily.
From May 6 to May 11, 1995, jail deputies administered the prescribed amounts of Biaxin and Elocon on five of six days.[2] On May 11, 1995, Zentmyer transferred to the Kane County jail for temporary detainment until a May 16 transfer to a State of Illinois prison. During medical screening, Zentmyer did not report any hearing loss, but the Kane County jail doctor noted Zentmyer’s outer-ear infection and recommended that he continue his medication. Three months later, on August 9, 1995, Dr. Perry Santos examined Zentmyer’s right ear after Zentmyer complained again of pain. In his report, Santos observed that “[t]here is an excoriated area” in the right ear “most consistent with a fingernail scratch.” He found “no inflammation or erythema or evidence of acute infection as well as no evidence of chronic infection.” Santos explained that there was no evidence of active outer-ear infection but there could be tenderness associated with a recently healed infection. On February 15, 1996, Dr. L. El-Diery examined Zent-myer and detected no perforation of the eardrum but noticed some ear trauma that he suspected was caused by “manipulation of the external ear canal with the placement of foreign bodies by the inmate.”
On April 15, 1996, Zentmyer was examined yet again, this time by Dr. Robert Kramer who declared Zentmyer’s ear “absolutely normal” with no evidence of infection. Nonetheless, Zentmyer continued to report pain and hearing loss. On Kramer’s request, audiologist Kathy Betestini tested Zentmyer’s hearing with a standard audiogram and found that Zentmyer reported no hearing at all in his right ear. Two years later, audiologist David Lewis performed another audiogram on Zent-myer and also found that Zentmyer reported no hearing in his right ear. However, suspicious of Zentmyer’s responses, Lewis conducted a second hearing test which “did not reveal that [Zentmyer’s hearing] is as bad as Mr. Zentmyer is claiming.”
On April 22, 1997, Zentmyer sued the defendants in district court under 42 U.S.C. § 1983 claiming that he was denied adequate medical care in violation of his Eighth and Fourteenth Amendment rights. Zentmyer argued that as a result of the defendants’ deliberate indifference to administering his medication properly, *810 the medication was rendered “useless” and he sustained a “totally dead” right ear. The district court immediately dismissed Zentmyer’s Eighth -Amendment claims, and on December 22, 1998, granted the defendants’ motion for summary judgment on Zentmyer’s Fourteenth Amendment claims.
II. ANALYSIS
The Eighth Amendment proscription on the infliction of cruel and unusual punishment requires that the government “provide humane conditions of confinement” and “ensure, that inmates receive adequate food, clothing, shelter, and medical care.” Farmer v. Brennan, 511 U.S. 825, 832, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). Among other things, these principles prohibit jail guards from “intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed.” Estelle v. Gamble, 429 U.S. 97, 104-05, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976).
However, liability results only when the defendant exhibits “deliberate indifference to serious medical needs.” Id. at 104, 97 S.Ct. 285; see also Henderson v. Sheahan, 196 F.3d 839, 844(7th Cir.1999). In Farmer, the Supreme Court explained that an inmate must satisfy a two-prong test to establish an Eighth Amendment claim: (1) the deprivation alleged must be objectively serious; (2) the prison official must have exhibited deliberate indifference to the inmate’s health or safety. Farmer, 511 U.S. at 834, 114 S.Ct. 1970. Although the Eighth Amendment does not extend to pretrial detainees like Zentmyer, the Due Process Clause of the Fourteenth Amendment protects pretrial detainees under the same standard as the Eighth Amendment. See Henderson, 196 F.3d at 844 n. 2; Payne v. Churchich, 161 F.3d 1030, 1041 (7th Cir.1998). Zentmyer appeals summary judgment on his Fourteenth Amendment claim “as to the individual deputies in their individual capacities” and argues that the defendants’ failure to administer medication exactly as prescribed constituted deliberate indifference to serious medical needs. We review de novo the district court’s grant of summary judgment and draw all reasonable and justifiable inferences in favor of the non-moving party Zentmyer. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); see also Reed v. McBride, 178 F.3d 849, 852 (7th Cir.1999).
An objectively serious medical need is “one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor’s attention.” Gutierrez v. Peters, 111 F.3d 1364, 1373 (7th Cir.1997) (citation and internal quotation omitted). Failure to “dispense bromides for the sniffles or minor aches and pains or a tiny scratch or a mild headache or minor fatigue — the sorts of ailments for which many people who are not in prison do not seek medical attention — does not ... violate the Constitution.” Cooper v. Casey, 97 F.3d 914, 916 (7th Cir.1996). Although an ear infection is a common malady that typically causes no permanent impairment, Zentmyer’s condition inflicted prolonged suffering and required treatment from a nurse and two doctors who prescribed painkillers and antibiotics for almost a month. Zentmyer also adduced evidence and expert testimony indicating that the infections lingered for months afterward and led eventually to a permanent loss of hearing. Defendants cite credible evidence that Zentmyer’s ear infection was mild at worst and that Zentmyer actually did not sustain hearing loss. However, resolving all factual ambiguities in his favor, we agree that Zentmyer raised a material question of fact whether he suffered from an objectively serious medical condition.
To overturn summary judgment, Zentmyer also must demonstrate a genuine question of fact whether the defendants were deliberately indifferent to his medical condition. The Court ex *811 plained in Farmer that “deliberate indifference entails something more than mere negligence.” Farmer, 511 U.S. at 836, 114 S.Ct. 1970; see also Pope v. Shafer, 86 F.3d 90, 92 (7th Cir.1996); Williams v. O’Leary, 55 F.3d 320, 324 (7th Cir.1995); Giron v. Corrections Corp. of Am., 191 F.3d 1281, 1286 (10th Cir.1999). For example, in Steele v. Choi, 82 F.3d 175, 178 (7th Cir.1996), a prison doctor was not deliberately indifferent, even assuming that a minimally competent doctor would have been able to identify and treat the plaintiffs injury under the circumstances, because he was not subjectively aware of the plaintiffs medical needs. Under this standard, “a prison official cannot be found hable ... for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.” Farmer, 511 U.S. at 837, 114 S.Ct. 1970.
Zentmyer cites the Court’s prohibition in Estelle on “intentionally interfering with the treatment once prescribed,” Estelle, 429 U.S. at 105, 97 S.Ct. 285, and claims that the deputies are liable because they collectively did not follow the doctors’ orders in dispensing his medication. Zent-myer points out that in total he missed five pills of Amoxicillin .out of thirty pills prescribed over eleven days; twenty-six applications of Otocort out of eighty applications prescribed over twenty days; and one dose each of Biaxin and Elocon out of ten doses prescribed for each over six days.
However, Zentmyer does not contend that any of the deputies named as defendants knew that Zentmyer might suffer serious injury or pain from the missing doses of medication. In fact, there is no evidence that any deputy thought missing doses of medication for an ear infection would cause a serious injury or loss of hearing. The doctors did not communicate to the deputies that the medication must be constantly applied or else be rendered useless, and Zentmyer admits that none of the defendants noticed any pus, discharge or other physical signs of injury from his ear infection. A string of negligent acts can evidence a plaintiffs exposure to a serious risk and a prison official’s awareness of such exposure, but “showing deliberate indifference through a pattern of neglect entails a heavy burden.” Dunigan ex rel. Nyman v. Winnebago County, 165 F.3d 587, 591 (7th Cir.1999). Furthermore, liability under § 1983 arises only when the plaintiff can show that the defendant was “personally responsible for a deprivation of a constitutional right.” Vance v. Peters, 97 F.3d 987, 992 (7th Cir.1996). Zentmyer does not present evidence that any individual defendant failed to administer so many doses that the defendant’s actions by themselves instantiate deliberate indifference, nor does Zentmyer allege any agreement among the defendants to deprive him of medical care. Instead, Zentmyer argues that he missed some medication and the deputies collectively were responsible for administering it.
The deputies’ failure to dispense Zent-myer’s medication consistently on schedule does not manifest conscious disregard for Zentmyer’s health. They responded to Zentmyer’s complaints and administered most of his medication according to schedule. The deputies gave him painkillers at least twice a day for twenty days and administered 97 of 130 doses of prescription medication on schedule as prescribed. In total, the deputies administered medication of various forms to Zentmyer 162 times over twenty days from April 22 to May 11, 1995. Zentmyer was treated by medical professionals and received antibiotics and painkillers regularly for a month. Indeed, Dr. Trevino concluded that Zent-myer’s middle-ear infection had healed promptly under the deputies’ care. Based on the record before us, each of several jail guards failed occasionally to administer doses of medicine without knowledge that *812 serious consequences might result from their lack of diligence in treating an earache. Failing to dispense medication exactly as prescribed may constitute negligence, see Jones v. United States, 91 F.3d 623, 625 (3d Cir.1996), but “the presence of multiple acts of negligence is merely evi-dentiary; it is not an alternative theory of liability.” Sellers v. Henman, 41 F.3d 1100, 1103 (7th Cir.1994). Given that the deputies knew only that Zentmyer suffered from an ear infection, the deputies were not so neglectful that deliberate indifference is apparent under the facts alleged. See Mahan v. Plymouth County House of Connections, 64 F.3d 14, 18 (1st Cir.1995) (finding that failure to administer prescription medication did not constitute deliberate indifference absent evidence that prison officials knew the plaintiff would suffer serious medical consequences without medication).
This is not to say that prison officials may substitute their judgments for a medical professional’s prescription. Of course they cannot. See Ralston v. McGovern, 167 F.3d 1160, 1162 (7th Cir.1999); Johnson v. Hay, 931 F.2d 456, 461 (8th Cir.1991). If a defendant consciously chose to disregard a nurse or doctor’s directions in the face of medical risks, then he may well have exhibited the necessary deliberate indifference. But deliberate indifference is an onerous standard for the plaintiff, and forgetting doses of medicine, however incompetent, is not enough to meet it here. Zentmyer cites several cases from other circuits decided before Estelle and Farmer finding that denial of prescribed medication, when combined with other privations, violated a prisoner’s substantive due process rights. None of these cases hold that failure to administer medication exactly as prescribed without additional exacerbating hardships violates the Eighth or Fourteenth Amendment. See Campbell v. Beto, 460 F.2d 765 (5th Cir.1972); Martinez v. Mancusi, 443 F.2d 921 (2d Cir.1970); Tolbert v. Eyman, 434 F.2d 625 (9th Cir.1970); Edwards v. Duncan, 355 F.2d 993 (4th Cir.1966).
Lastly, the district court properly granted summary judgment for Commander Hawkins on Zentmyer’s Fourteenth Amendment claim. For liability, a supervisor “must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye,” so Hawkins can be liable as a supervisor only if Zentmyer demonstrates that constitutionally deficient medical care occurred at Hawkins’s direction or with his knowledge and consent. Gentry v. Duckworth, 65 F.3d 555, 561 (7th Cir.1995). Zentmyer’s attorney telephoned Hawkins about Zentmyer’s earache and treatment, but Hawkins investigated the complaint and was told by three deputies that Zentmyer was receiving medication as prescribed. Under the circumstances, Hawkins reasonably believed his deputies’ reports and otherwise had no involvement with Zentmyer’s medical care.
III. Conclusion
For the foregoing reasons, we AffiRM the decision of the district court granting the defendants’ motion for summary judgment.

. Zentmyer took three pills of Amoxicillin a day on six days. Gaddam prescribed Amoxi-cillin and Olocort around midday on April 22, so Zentmyer received only two pills of Amoxi-cillin and only three applications of Otocort during the remaining half day. Similarly, Zentmyer received only one application of Otocort before his midday departure from the jail on May 11.

. Zentmyer received one dose of each on May 6 after his 4:20 p.m. appointment with Trevino and one dose of each on May 11 before his midday discharge from the jail. Zentmyer received the prescribed two doses of both Biaxin and Elocon on all the remaining days except May 7, when he received only one dose of each.