Steven A. CONWAY, Plaintiff–Appellant,

v.

Robert HENZE, et al., Defendants–Appellees.

No. 00–2344.

United States Court of Appeals, Seventh Circuit.

Submitted June 27, 2001.*

Decided June 29, 2001.

---

* After an examination of the briefs and the record, we have concluded that oral argument is unnecessary. Thus, the appeal is submitted on the briefs and the record. *See* Fed. R.App. P. 34(a)(2).

Before POSNER, RIPPLE, and
DIANE P. WOOD, Circuit Judges.

ORDER

Steven Conway, who at all relevant
times was a Wisconsin pretrial detainee,
filed this suit under 42 U.S.C. § 1983 al-
leging that he received inadequate psychi-
atric care during his five-month detention
in the Jefferson County Jail ("Jail"). Mr.

Conway further alleged that the Jail administrator, Robert Henze, subjected him to unconstitutional conditions of confinement and violated the Americans with Disabilities Act and his Fourth Amendment right to privacy. The district court granted summary judgment to the defendants and we affirm.

In August 1993, Mr. Conway was arrested for attempted murder of his ex-girlfriend. At his arrest, Mr. Conway was intoxicated and therefore he was sent to a detoxification facility. During both his arrest and his subsequent placement in the detoxification facility, Mr. Conway repeatedly stated that he was going to commit suicide. Because of these statements, Mr. Conway was transferred to Mendota Mental Health Institute and, pursuant to a state court order, evaluated for emergency detention in a psychiatric hospital. Under Wisconsin law, *see* Wisc. Stat. § 51.15, the two main factors in determining whether an individual should be detained are if he has a mental illness and if he is a threat to himself or others. The two Mendota psychiatrists who evaluated Mr. Conway both agreed that he was not mentally ill and did not need to be confined in a psychiatric facility. One psychiatrist opined that Mr. Conway's risk of suicide was no greater than moderate, while the other concluded that Mr. Conway's remarks regarding suicide were manipulative rather than genuine. The state court therefore ordered Mr. Conway transferred to the Jail on August 23, 1993.

Mr. Conway's stay at the Jail was marked by repeated threats and attempts to harm himself. Mr. Conway regularly reported to Jail officials that voices were instructing him to commit suicide and that he was planning to injure or kill himself. On August 26 and September 3 Mr. Conway took several pills that he had stockpiled; the pills were apparently not harmful, however, and merely made Mr. Conway drowsy. On August 24 Mr. Conway attempted to cut his arm with an eggshell. On August 30 he cut his arm with a piece of cement from the wall of his cell. On September 10 he made cuts to his wrist with a staple. On October 1 he scraped his arms with a piece of plaster. On November 19 he cut his arm with a pencil. On November 21 he repeatedly banged his head on a cement block and then stuck his hand in his cell door while it was closing. When Jail officials gave Mr. Conway an ice pack for his hand, he tore it open and ate the contents, thereby requiring Jail officials to induce vomiting. On November 29 Mr. Conway's stomach was pumped after he ingested the contents of a battery that he obtained after being allowed to go to the Jail's exercise facility.

Mr. Conway spent the month of December in the Buffalo County Jail while awaiting a probation revocation hearing. His time there was marked by repeated self-harming behavior: his stay included attempts to choke himself, and on other occasions he cut his neck, elbow, and wrists with a razor.

Mr. Conway returned to the Jefferson County Jail in January. According to the Jail's control logs, Mr. Conway refused to eat from January 8 to 10, 1994, and he informed a deputy that he was trying to starve himself. On January 22 Mr. Conway cut his arms with a razor blade. On January 28 Mr. Conway drank a bottle of rubbing alcohol and was taken to the hospital for treatment.

On February 15 Mr. Conway returned to Mendota to be evaluated for his competency to stand trial. At first Mendota staff deemed him not competent because of his suicidal behavior. After two months' treatment, however, the doctors at Mendota determined that Mr. Conway no longer needed psychiatric treatment, could

be transferred back to the Jail, and was competent to stand trial. Mr. Conway was transferred back to the Jail on April 16. Eleven days later he pleaded guilty to the attempted murder charge and was transferred to a Wisconsin state prison.

While Mr. Conway was at the Jail, staff took numerous steps in response to his suicidal behavior. So that Jail officials could more easily observe him, Mr. Conway spent 150 of his days at the Jail in one of the Jail's five holding cells. For 30 of those days, Jail officials placed Mr. Conway on a suicide watch during which a staff member would check on him at least every half hour. On two occasions, Mr. Conway was also strapped in a restraining chair to prevent him from harming himself. As further precautions, Jail officials often allowed Mr. Conway to wear only underwear, and once shut off the water to the holding cell after Mr. Conway said that voices told him to drown himself.

The holding cells at the Jail provided for very little privacy. They were located along a corridor used by Jail staff and both male and female inmates. People walking down the corridor could see into the cells. Three of the holding cells were also visible from the visitors' booth when Jail staff failed to close the door between the visitation room and the corridor leading to it. Because of this lack of privacy, on eight occasions female inmates and visitors observed Mr. Conway using the bathroom in his cell. Mr. Conway further asserts that in addition to their barred doors, the holding cells had solid steel doors that could have been closed to provide privacy while he used the toilet, but Jail staff refused to close those doors under any circumstances.

While in the holding cell, Mr. Conway's access to showers and hygiene items was limited. Though the holding cells had a wash basin with hot and cold water, Mr. Conway had to ask permission to take a shower. Mr. Conway alleges that he was denied a shower every day for his first month at the Jail, but Jail logs show that he received five showers during that month. It is undisputed that Mr. Conway received a shower at least once per week while in the holding cell after his first month at the Jail. Mr. Conway was also not allowed to have hygiene items in the holding cell; he had only supervised access to such items when he took a shower. On a number of occasions, Mr. Conway was transferred to the general population unit of the Jail, where he had unlimited access to showers and hygiene items.

Besides the precautions taken by the Jail staff, Mr. Conway was visited 31 times by various employees of the Jefferson County Human Services Department ("Department"), which provided psychiatric services for the Jail. The Department has three different types of staff relevant to this case. First, Department intake workers evaluate inmates and determine if they qualify for emergency detention at a psychiatric facility. Second, to provide counseling and coordinate appropriate treatment with doctors, a Department social worker is assigned to inmates who demonstrate signs of mental illness. Finally, a Department psychiatrist determines what, if any, medications an inmate should take.

A total of four different intake workers assessed Mr. Conway on 11 separate occasions during his time at the Jail. These assessments were all made at the request of Jail staff after Mr. Conway made suicidal statements or attempted to harm himself. After their visits, the intake workers suggested that Jail staff continue to monitor Mr. Conway closely, but not once did any intake worker recommend emergency detention. On two occasions, September 21 and November 19, intake workers noted that their assessments of Mr. Conway involved consultations with intake supervisor

Tom Toshner and Department director Tom Schleitwiler.

The Department assigned social worker Carol Melody to counsel Mr. Conway. After requests by Jail staff, Melody met with Mr. Conway eight times to assess his condition, ensure that he was receiving proper medication, and provide counseling. Melody determined that Mr. Conway suffered from borderline personality disorder and psychosis. She also believed that there was a substantial probability that Mr. Conway would harm himself. After her September 22 visit, Melody informed Jail staff that she believed Mr. Conway should be sent to a psychiatric hospital but noted that such a transfer would have to be discussed with Toshner. The record contains no evidence regarding whether such a discussion occurred.

Finally, the Department's medical director, Dr. Melvin Haggart, met with Mr. Conway five times to prescribe and adjust medication. Haggart prescribed two anti-psychotic drugs, Haldol and Loxitane; an anti-depressant, Prozac; and a drug used to treat unstable moods, aggression, and depression, Tegretol. When one of the medications caused Mr. Conway to suffer from incontinence in November 1993, Haggart promptly visited Mr. Conway and adjusted the medication level.

In April 1998 Mr. Conway filed this suit asserting that Toshner, Schleitwiler, Melody, and Haggart provided inadequate medical care for his mental condition. Specifically Mr. Conway alleged that Toshner and Schleitwiler failed to transfer him to a psychiatric hospital, Melody failed to visit him more often, and Haggart failed to provide any treatment in addition to medication. In support of his claim, Mr. Conway provided deposition testimony from an expert witness named Dr. Kenneth Smail, who stated that Mr. Conway should have been sent to a psychiatric hospital and that the treatment plan developed by the de-

fendants was inadequate. Smail, however, also testified that the Department employees "were not callous to [Mr. Conway] ... the response was inadequate but not callous. They weren't indifferent to him."

Mr. Conway also brought a number of claims against Henze. First he asserted that Henze subjected him to unconstitutional conditions of confinement by placing him in the holding cells and by denying him showers and hygiene items. Mr. Conway also alleged that the denial of showers and hygiene items violated the ADA as both discrimination on the basis of his mental disability and a failure to accommodate that disability. Finally, Mr. Conway claimed that his Fourth Amendment right to privacy was violated because female inmates, staff, and visitors could see into the holding cells, even when he was using the toilet.

In a detailed, 45–page order addressing all of Mr. Conway's claims, the district court granted summary judgment to the defendants. On appeal, Mr. Conway, who had counsel in the district court but is now proceeding *pro se*, reasserts his claims against the defendants and argues generally that the district court's ruling was incorrect. We review the district court's ruling de novo. *See Dunigan v. Winnebago County*, 165 F.3d 587, 590 (7th Cir. 1999).

As to Mr. Conway's medical care claims, we note that a pretrial detainee's claim of inadequate medical care is brought under the Due Process Clause of the 14th Amendment. *See Chavez v. Cady*, 207 F.3d 901, 904 (7th Cir.2000). Such claims, however, are analyzed in much the same way as an Eighth Amendment claim of deliberate indifference to a serious medical need brought by a prisoner. *See id.* Therefore, to survive summary judgment, Mr. Conway was required to show that he had a serious medical

need, defendants knew of the serious medical need, and that the defendants disregarded or were deliberately indifferent to that need. *See id.* at 905; *Collignon v. Milwaukee County,* 163 F.3d 982, 988–89 (7th Cir.1998).

■ As the district court properly noted, Mr. Conway failed to raise any issue of fact concerning the defendants' treatment of his psychiatric condition. The main basis for Mr. Conway's medical claim is that the defendants failed to order emergency detention at Mendota. This argument, however, amounts to little more than a difference in opinion over how Mr. Conway should have been treated, and such disagreements do not constitute deliberate indifference. *See Abdul–Wadood v. Nathan,* 91 F.3d 1023, 1025 (7th Cir.1996). As for Mr. Conway's assertions that Melody failed to visit him frequently enough and that Haggart failed to do anything but prescribe and adjust his medication, we note that any deliberate indifference analysis requires us to consider the totality of the care provided. *See Dunigan,* 165 F.3d at 591; *Gutierrez v. Peters,* 111 F.3d 1364, 1374–75 (7th Cir.1997). It is undisputed that Mr. Conway received extensive psychiatric attention throughout his confinement: in addition to the precautions taken by Jail officials, Mr. Conway was visited 31 times within five months by Department employees. Furthermore, the record shows that every time Mr. Conway had an incident of self-harm, some member of the Department came to visit him. Although the Department might have done more, and other medical officials might have taken different steps in treating Mr. Conway, this record—as Mr. Conway's own expert, Dr. Smail, admits—does not show that Department employees were "callous" to Mr. Conway's needs. The district court properly rejected Mr. Conway's psychiatric care claims.

■ Turning next to Mr. Conway's claim that he was subjected to unconstitutional conditions of confinement, we note that the state must provide a pretrial detainee with the basic necessities of life. *See Collignon,* 163 F.3d at 988; *Tesch v. County of Green Lake,* 157 F.3d 465, 472–73 (7th Cir.1998). Mr. Conway claims that his Due Process rights were violated by his placement in the holding cells and the limitations on showers and access to hygiene items. The relevant consideration in analyzing such a conditions-of-confinement claim is to determine whether the conditions were imposed with an intent to punish or pursuant to some legitimate administrative goal. *See Bell v. Wolfish,* 441 U.S. 520, 534–38, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979); *Zarnes v. Rhodes,* 64 F.3d 285, 291 (7th Cir.1995).

■ The district court correctly held that Mr. Conway could not survive summary judgment on his conditions-of-confinement claim. First, his jail conditions do not appear to be substandard. Mr. Conway has not asserted that the holding cell itself was insufficient in terms of size, sanitariness, temperature, and the like, and the record shows that Mr. Conway received a shower at least once per week and always had access to a wash basin in his cell. *See Davenport v. DeRobertis,* 844 F.2d 1310, 1316–17 (7th Cir.1988) (holding weekly showers and unlimited access to washbasin constitutionally sufficient). Second, Mr. Conway has not provided any evidence suggesting that his confinement in a holding cell, the limitations on his showers, or his lack of access to hygiene items was anything other than a legitimate response to his suicidal behavior. *See, e.g., Tesch,* 157 F.3d at 475–76 (upholding placement of wheelchair-bound pretrial detainee in cell designed to accommodate inmates confined to a wheelchair); *Zarnes,* 64 F.3d at 290–91 (upholding placement of

pretrial detainee in segregation after verbal conflict with another inmate); *Davis v. Hall,* 992 F.2d 151, 153 (8th Cir.1993) (upholding placement of pretrial detainee in solitary confinement based solely on detainee's medical condition).

■ The district court also properly rejected Mr. Conway's privacy claim because Mr. Conway offered no evidence that a named defendant was personally responsible for any violation of Mr. Conway's privacy rights that might have occurred. *See Vance v. Peters,* 97 F.3d 987, 992 (7th Cir.1996); *Gentry v. Duckworth,* 65 F.3d 555, 561 (7th Cir.1995). The only Jail official named by Mr. Conway, Henze, stated at his deposition that he thought Jail staff closed the steel doors to provide privacy to the inmates in the holding cells. Mr. Conway has provided no evidence that Henze either refused to close the doors or was made aware of refusal by the guards to close the door.

■ The district court also properly rejected Mr. Conway's claim that Henze violated the ADA by limiting his access to showers and hygiene items. Mr. Conway alleged that these limitations constituted both discrimination against him because of his mental illness and a failure to accommodate his mental illness. *See Sieberns v. Wal-Mart Stores, Inc.,* 125 F.3d 1019, 1021–22 (7th Cir.1997). As the district court properly noted, however, Mr. Conway presented no evidence suggesting that Henze's decision to provide limited access to showers and hygiene items was anything but a reasonable response to Mr. Conway's suicidal behavior.

■ Finally, Mr. Conway asserts that his counsel in the district court provided ineffective assistance. There is no right, however, to effective assistance of counsel

in a civil case. *See Bell v. Eastman Kodak Co.,* 214 F.3d 798, 802 (7th Cir.2000).

For the foregoing reasons, we AFFIRM the grant of summary judgment to the defendants.